LEEDY, C. J., and DALTON, HOLLINGSWORTH, HYDE and WESTHUES, JJ., concur.

STATE of Missouri, Respondent,

v.

Glenn CHERNICK, Appellant.

No. 44353.

Supreme Court of Missouri.

Division No. 1.

May 9, 1955.

Morris A. Shenker, St. Louis, for appellant.

John M. Dalton, Atty. Gen., John S. Phillips, Asst. Atty. Gen., for respondent.

VAN OSDOL, Commissioner.

Defendant was convicted of assault with intent to kill with malice aforethought,

Section 559.180, RSMo 1949, V.A.M.S., and his punishment assessed by a jury at twenty years in the state penitentiary. He has appealed from the ensuing judgment.

The charge by indictment arose out of events occurring April 24, 1953, during a robbery of the Southwest Bank at the southwest corner of the intersection of Southwest Avenue and Kingshighway Boulevard in St. Louis.

January 25th, two days before the trial of the instant case began on January 27, 1954, defendant was convicted of robbery in the first degree by means of a dangerous and deadly weapon, Sections 560.120 and 560.135, RSMo 1949, V.A.M.S., and his punishment was assessed at five years in the state penitentiary. This conviction was upon evidence of events occurring during the same robbery of April 24th. Defendant has also appealed from the judgment and sentence for robbery.

A little after ten in the morning of April 24, 1953, three armed men entered the offices of the Southwest Bank. One of the armed men, Fred Bowerman, took a position on a counter near an entrance of the bank and, armed with a sawed-off shotgun, "covered" the employees and customers of the bank, and directed the movement of his confederates. Another, Frank Vito, carrying a satchel, gathered cash from various tellers' cages; and the other, one William Fred Scholl, crouched in front of a counter and, with pistols, was also covering the employees and customers. Soon after the three armed men had entered, Robert Heitz, a policeman, entered the bank through a north (Southwest Avenue side) door, and fired his pistol striking Scholl through the back. The noise of the discharge of Heitz' pistol attracted the attention of Vito and Bowerman who both fired at Officer Heitz. The officer sustained shotgun wounds in the right side of the neck, the right ear and right side of the head, and a pistol wound in the right shoulder. Subsequently, and within a very few minutes, the bank building was surrounded by many policemen. Although Vito had taken large sums of money from tellers' cages, the three—Bowerman, Vito and Scholl—were unable to escape. Bowerman, using a lady customer as a hostage and shield, attempted to escape through the front door of the bank building, and was shot and fatally wounded by Officer Stein; Vito destroyed his own life; and Scholl, wounded by Officer Heitz, surrendered.

It is not the position of the State that the evidence shows defendant was inside and participating in the actual robbery. It was, and is, the State's theory that defendant, acting in concert with Bowerman, Vito and Scholl, was constructively present and aiding and abetting by operating a "getaway" car. There was evidence introduced tending to show that a 1951-model Oldsmobile of green color was parked headed southwardly at the curb in a "no parking" zone on the west side of Kingshighway and east of the bank building. At a time when it could have been seen that police officers had the bank building entirely surrounded and that Bowerman, Vito and Scholl were entrapped, the driver of this automobile drove away. There was evidence that, at the time, Vito had remarked to Scholl that "the car was gone." It is the State's factual theory that defendant was the driver of the green Oldsmobile; that it was the getaway car; and, consequently, that defendant was present and aiding and abetting Bowerman, Vito and Scholl.

Defendant-appellant makes the primary contention the trial court erred in overruling his motion to dismiss the indictment, or to stay the proceedings of the instant case until the judgment upon the conviction of robbery may become final. It is defendant's position that he has been again put in jeopardy for the same offense of which he was formerly convicted, in violation of constitutional provision, Const. art. I, § 19, V.A.M.S. Defendant-appellant further contends the trial court erred in overruling his motion for a judgment of acquittal. He urges the evidence was insufficient in tending to show defendant was present and was in fact the driver and in charge of the getaway car. Defendant-appellant makes other contentions of er-

rors of the trial court to some of which we shall allude, after we shall have examined the evidence tending to show defendant's guilt and his contention of former jeopardy.

There was evidence introduced by the State tending to show that a young man using the name of "George Roche" appeared at the home of a Mrs. Ottinger at 1918 Victor Street on April 14, 1953, and rented rooms which were occupied by him and another, who, it may be inferred, was Bowerman or Vito. Mrs. Ottinger was later able to identify defendant as the young man who rented the rooms. Defendant and the other man occupied the rooms at the Ottinger home until April 24th, the day of the robbery. On that day they left the rooms a little after seven in the morning. Defendant was again seen at the Ottinger home at a quarter after eleven that morning, and again at about one in the afternoon. Investigating officers subsequently examined articles of men's apparel found in the rented rooms. Some of the garments were marked "V-e(or i)-t-o."

The Ottinger residence is about a block and a half from a point on Lemp Avenue where the police officers later discovered a parked black 1950-model Oldsmobile. This car bore a Missouri license plate and had an Illinois license plate under the seat. It is inferred the car had belonged to Vito. The police officers also found a Hudson automobile on Shaw Avenue, the title of which had been issued to "John W. Fredricks"—the name Bowerman was using at the time of the robbery. This automobile also had an Illinois license plate under the seat. The Oldsmobile of green color, which automobile the State asserts defendant was using at the time of the robbery, was found early the next day, April 25th, on a street about six blocks from the Southwest Bank.

Angeline Strippgen, who was employed at a restaurant across the street from the Southwest Bank building, and her husband, Theodore Strippgen, testified that a man, later identified as defendant, and another man (apparently Vito) had come to the restaurant at about four-thirty in the afternoon of April 22d. These men asked for directions to the point, Kingshighway and Gravois, but walked to the restaurant window—the one that "faces out" toward the bank—and "they stood there and conversed in low tones."

Gertrude Eschrich, who, April 22d, was on duty at her husband's hardware store on Gravois, about two and a half blocks from the Ottinger home on Victor street, testified that two men, one of whom (the younger) she later identified as defendant and the other as Bowerman, entered the store and asked for ammunition of a particular caliber. The witness could find no ammunition of that caliber in stock, and the men departed.

Myrtle Howard, a Salvation Army collector, was at her station outside of the Southwest Bank on the morning of April 24th. Her position was "right at the front door." At ten or ten-fifteen she learned there was a "holdup" in progress in the bank and, after the policemen came and there was "shooting," her attention was drawn to a car "out there in front." The car had a real light top and little darker body. A man got out of the car on the passenger side, the side nearest the curb; the man had on a light tan suit and a light tan overcoat. He "pulled a gun out" and pointed it at the witness or at Officer Stein. The man then walked around the hood of the car and stood on the other side. He had the gun pointed through the glass. He stood there for about two minutes, "and then got in the car and drove away real fast." The witness did not get a look at the man's face.

An unidentified person had noted the Illinois license plate number displayed on the green Oldsmobile and reported the number to the police. This Oldsmobile, as stated, was found the next day within a few blocks from the bank. It was a stolen car. This automobile had been seen by a witness, Richard Compton, who had parked his own automobile near the bank while the robbery was in progress. He heard some

confusion, and then saw a man get into the green Oldsmobile and drive away. The man was dressed in brown or tan, wore a topcoat and had a khaki handkerchief on his face.

Casmir Lapski was a paper vendor, with position in front of the bank building on April 24th. He is Polish, and testified through an interpreter. The witness testified he saw defendant drive a green automobile to a point near the bank. This, he said, was about a quarter after nine in the morning. He identified defendant as the driver of the car. The driver turned and stopped the car on Southwest Avenue. Two other men got out of the car, and the driver turned the car around and drove away. The witness said the policemen later "took the car and took him (the driver)." He further testified of seeing the automobile on Shenandoah, east of Kingshighway; and he also saw the car on the west side (and again, he said, on the east side) of Kingshighway—it was parked there about twenty minutes.

Defendant was apprehended in Chicago and was returned to Missouri in June, 1953. He was questioned by the Circuit Attorney of the City of St. Louis on June 25th. The Circuit Attorney testified that defendant saw, and admitted recognition of Mrs. Ottinger (and he recognized a Mrs. Cheney, who with her husband was residing at the Ottinger home in April, 1953). Defendant admitted he and Vito were in St. Louis the preceding April, and that he knew Bowerman. Defendant corrected a statement which had been purportedly made by Scholl that a getaway car had been parked under the viaduct on Kingshighway. Defendant said no woman was involved in the robbery, and that the officers were wasting their time looking for one. He further said, "I'll tell you all about it if I can get ten years. Would I be able to get a ten-year sentence?"

▮ Defendant asserts the evidence introduced by the State, which we have set out supra, supports no more than a possible suspicion of defendant's participation in the crime. To this we cannot agree. We have the opinion the evidence of defendant's actions in apparent preparation for the execution of a plan to rob, including the evidence tending to show the purchase of ammunition and tending to show the defendant and Vito, but two days before, were "casing" the Southwest Bank building and the testimony of defendant's statements to the Circuit Attorney signifying defendant's contacts with Bowerman and Vito and defendant's familiarity with positions of the "getaway" cars, all indicating defendant's association in an apparent concert of plan with Bowerman and Vito to the end of the consummation of the robbery actually perpetrated at the bank by these man and Scholl; the testimony of defendant's statements indicating consciousness of guilt, including defendant's offer to tell the officers "all about it" if he could get a sentence of but ten years, see State v. Christian, Mo.Sup., 245 S.W.2d 895; the testimony of witnesses identifying the green Oldsmobile as being an automobile operated by a man who was there present and in position to aid by operating the vehicle as a getaway car, and who hastily drove away upon observing the arrival of the police in force; and the testimony of the witness Lapski that he saw defendant in the automobile which was parked at various positions in the near vicinity of the bank prior to and while the robbery was in progress, constituted substantial evidence supporting the submission and a jury's finding that defendant was guilty as charged. It is true the testimony of the witness Lapski was not so clear or explicit as that of one who directly answers a questioner, and not all of his testimony was in harmony with that of other witnesses for the State with respect to time, directions and distances, and at one place in his testimony he apparently had confused the Oldsmobile with some other vehicle. We think the consideration of these matters were for the jury in determining the weight and value of his testimony; and we believe his testimony, considered together with that of other witnesses indicating that the driver of the Oldsmobile was similarly garbed, and was

of the approximate age and height of defendant, was sufficient and substantial and justified a submission and finding that defendant was the driver of the vehicle and that the evidence in its entirety was substantial in tending to show defendant was there present and standing by and in a position to aid his alleged confederates in perpetrating the robbery, and to transport them away from the scene upon a successful consummation of their purpose.

Attending defendant-appellant's contention of former jeopardy—

■ If two or more persons join in a purpose to commit a crime, each of them, if actually or constructively present, is not only guilty as a principal, if the other (or others) commits that particular crime, but he is also guilty of any other crime committed by the other in pursuance of the common purpose, or as a natural or probable consequence thereof. State v. Plotner, 283 Mo. 83, 222 S.W. 767; State v. Darling, 216 Mo. 450, 115 S.W. 1002, 23 L.R.A.,N.S., 272; 22 C.J.S., Criminal Law, § 87, pp. 155–157. Herein we have substantial evidentiary support for the conclusions that two crimes were committed during the progress of the Southwest Bank robbery—one, the robbery itself, and another (not in contemplation at the outset perhaps, but one which was a probable consequence of the armed robbery) that is, the assault and discharge of dangerous and deadly weapons at and against Officer Heitz. Of course, it could be said these two statutory offenses (and the indictments charging this defendant with guilt in commission of each of them) arose out of the same set of facts, or, as might be in another way expressed, "out of the same transaction." In this connection, defendant-appellant contends that, because the charge of robbery and the instant charge of assault arose out of the same transaction, the conviction or acquittal of the one would invoke a constitutional bar of a prosecution of the other. He cites State v. Mowser, 92 N.J.L. 474, 106 A. 416, 4 A.L.R. 695, see also State v. Greely, 30 N.J.Super. 180, 103 A.2d 639, in which case a defendant was charged in separate indictments with robbery and murder, the murder being the result of the act of defendant in the perpetration of the robbery. Defendant Mowser's plea of guilty to the charge of robbery was held to be a bar of the subsequent prosecution on the charge of murder. The reasoning of the court was that the term "same offense" means not only the offense as an entity and designated as such by legal name, but also any integral part of such offense which may subject an offender to a charge and punishment, and when the integral part is not a distinct affair, but grows out of the same transaction, the acquittal or conviction of an offender for the lesser offense should be held to be a bar of a prosecution for the greater. However, this court has examined the Mowser case; has (in an analogous factual situation wherein a homicide was committed in the progress of a robbery) rejected what may be called the "same transaction test" which, it was thought, the Mowser case supports; has announced a preference for the separate or several offense rule in an analogous situation; and has held that in such a case an offender is not to be exonerated for his acts although he is persuaded or impelled to commit two or more offenses during a transaction. State v. Moore, 326 Mo. 1199, 33 S.W.2d 905; State v. Bobbitt, 228 Mo. 252, 128 S.W. 953. See also, State v. Temple, 194 Mo. 228, 92 S.W. 494, and State v. Martin, 76 Mo. 337.

The so-called separate or several offense rule, of course, does not supply the governing principle in all cases. See State v. Toombs, 326 Mo. 981, 34 S.W.2d 61, and cases therein considered; and see generally 22 C.J.S., Criminal Law, §§ 278–298, pp. 414–455. For example, it is said offenses constituting one act, one intent, and one volition may not be divided into parts and more than one part made the subject of prosecution. State v. Toombs, supra.

■ While there is the common essential element of "assault" in robbery and in assault as charged herein, and evidence of the robbery may have been admissible as part of the res gestae in the trial of the in-

stant case, the robbery was not necessarily involved in the instant offense as charged, and the facts essential to a conviction in the instant case would not necessarily convict defendant of robbery. We are of the opinion the two offenses were not merged into one, although they grew out of the same transaction. State v. Moore, supra.

█ We now consider a contention involving the right the law recognizes in all who are charged with crime to test the trustworthiness of testimonial assertions against them.

Over defendant's objection, the trial court permitted State's counsel to state in the opening statement to the jury that, on the day of and the day after the robbery, the Circuit Attorney had questioned Scholl, "one of the wounded holdup men." State's counsel further stated, "We expect to show immediately after the questioning of Scholl there was an arrest order put out for the arrest of Glenn Chernick * * *." Counsel for defendant had stated as a ground for the objection, "Of course, the point I am objecting to is not only that Mr. Dowd (the Circuit Attorney) had conversations with Scholl but that immediately thereafter basing the thought or leaving the thought in the jurors minds because of something Scholl told him, because of his conversation with Scholl, and solely for that reason, he immediately placed out an arrest order for Chernick, in fact, telling them in fact that Scholl's statement caused him to do this, and of course, that is definitely hearsay."

Again during the trial, the Circuit Attorney testified over defendant's objection that he, the Circuit Attorney, had questioned Scholl the day of the robbery, and on the following day, and an "arrest order was put out for Glenn Chernick." Defendant's counsel had objected on the ground,— "That's not binding on this defendant. It's highly improper, what this man did after questioning Scholl in regard to this defendant, Chernick."

And, again in argument, over defendant's objection, the Assistant Circuit Attorney argued to the jury that the Circuit Attorney went to the hospital and questioned Scholl "and that immediately after questioning Scholl he put out an arrest order for the defendant Glenn Chernick. * * * What do you think? You can draw any reasonable inference from the facts you want. I am bound by the record and of course you are bound by the testimony, but the testimony is that they questioned Scholl—I questioned him and Mr. Dowd questioned him—and that immediately after questioning him the arrest order for the defendant, Glenn Chernick, was put out, and as it turned out he was arrested in Chicago three days later. Now remember that he was arrested after Scholl was questioned. * * * I talked to Scholl, * * * the only other live man left in the holdup, and also Mr. Dowd talked to Scholl, and an arrest order was put out for Glenn Chernick. I can't go into the details; it would be strictly inadmissible at this point. I can't go into the details of what Scholl said but use your own common sense as to what he said. It's up to you * * *." Defendant's counsel had interposed the objection, "This is improper argument. I will ask that it all be stricken, * * * it's based upon hearsay. I will ask counsel be reprimanded * * *. I will ask the jury to be instructed to disregard it and a mistrial be declared."

Now the circumstance of the questioning of the wounded Scholl at the hospital by the Circuit Attorney and his assistant obviously occurred without defendant's presence and when defendant and the others were no longer acting together or with a common purpose, if so, in the furtherance of crime at the Southwest Bank. The coactors' purpose had been frustrated and their joint action ended by the intervention of the police—Scholl was hospitalized, Bowerman was fatally wounded, and Vito was dead. The subsequent statements of Scholl to the Circuit Attorney were hearsay and inadmissible as evidence of the fact asserted. The conduct, in itself, of the Circuit Attorney in putting out an immediate arrest order was not material or relevant to any issue of the case, so the

fact that Scholl made a statement was not admissible in tending to explain the conduct of the Circuit Attorney. The testimony tending to show the facts that Scholl had made a statement and that the Circuit Attorney immediately put out an arrest order was utilized by State's counsel, over defendant's objection, to show inferentially or circumstantially that Scholl had implicated defendant as a participant in the furtherance of the robbery. The broad inference supported by these facts, and urged and driven home in argument was quite as prejudicial, if not more so, as would have been whatever it was Scholl actually said. Defendant's counsel correctly and aptly stated the grounds for his objection that the evidence (and argument) was improper, not binding upon defendant, and based upon hearsay. It would seem clear that the same considerations which would have invoked the rule excluding the actual assertions of Scholl would forbid that any inference against defendant should be drawn from the conduct of the Circuit Attorney actuated by what Scholl said. We hold the trial court's action in overruling the objection was prejudicially erroneous.

■ The essential principle of the hearsay rule is that for the purpose of securing trustworthiness of testimonial assertions, and of affording the opportunity to test the credit of the witness, such assertions are to be made in court, subject to cross-examination. And, if the declaration of a co-conspirator or co-actor sought to be shown in evidence is not in furtherance of the object of the unlawful combination, or if it was made prior to the formation thereof, or after the consummation of the purpose thereof, the objection to be made is that such declaration is hearsay statement and not binding upon the co-conspirator or co-actor on trial. Vol. 2, Wharton's Criminal Evidence, 11th Ed., § 699, p. 1183, at page 1188; State v. Hill, 352 Mo. 895, 179 S.W.2d 712; State v. Priesmeyer, 327 Mo. 335, 37 S.W.2d 425; State v. Buckley, 318 Mo. 17, 298 S.W. 777; State v. Kennedy, 177 Mo. 98, 75 S.W. 979; State v. Duncan, 64 Mo. 262. (Conceptions of the hearsay rule as recognizing

the further incidental imprint of trustworthiness because of the oath administered to a witness, and of confrontation and the related constitutional guaranty that in a criminal prosecution the accused shall have the right to meet the witnesses against him "face to face," are also involved. Const. art. I, § 18(a), V.A.M.S.; State v. Gorden, 356 Mo. 1010, 204 S.W.2d 713; Vol. V, Wigmore on Evidence, § 1362, pp. 3-7.) After the common enterprise is ended, whether by accomplishment or abandonment, no one of the conspirators or joint actors is permitted by any subsequent act or declaration of his own to affect the others. State v. Ross, 29 Mo. 32.

■ Defendant-appellant has also made a contention of error in the giving of Instruction No. 1 submitting the issue of defendant's guilt. Upon retrial the submission should be restudied and the instruction redrafted so as to obviate the possible criticism that the instruction assumed and did not submit to the jury that defendant was present and aiding and abetting. Upon voir dire hearing, without the presence of the jury, upon the preliminary question of the "voluntariness" and admissibility of defendant's statements to the Circuit Attorney, the trial court rejected defendant's proffer that at the time of the interrogation defendant had engaged counsel and desired and was denied a conference with counsel; and the trial court further rejected defendant's proffer of evidence that his counsel's associate had vainly sought an interview with defendant at the very time the Circuit Attorney was questioning defendant. This proffered evidence would have at least had the tendency of showing the attitude of the questioning officers, and the atmosphere of the interrogation. Although the State had made a prima facie showing that the defendant's statements were made voluntarily, we believe the evidence excluded should have been heard, considered and weighed for what it might have been considered to have been worth upon the issue of the voluntariness and consequent admissibility of defendant's statements. Defendant-appellant has also contended error of the trial

court in refusing to grant a continuance on the ground of assertedly prejudicial publicity, which defendant insists was inspired by the prosecuting officers through the press, over the radio and by television at the time of and just after the trial of and conviction of defendant for robbery—two days before the beginning of the trial of the instant case. In view of the reversal and remand, this contention is now of no significance; and other trial incidents, of which defendant-appellant complains, may not recur upon retrial.

The judgment should be reversed, and the cause remanded.

It is so ordered.

COIL and HOLMAN, CC., concur.

PER CURIAM.

The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the court.

All of the Judges concur.