STATE of Missouri, Respondent,

v.

Danny D. HANDLEY, Appellant.

No. 60590.

Supreme Court of Missouri.

July 17, 1979.

Rehearing Denied Sept. 11, 1979.

William E. Shull, Philip D. Gettig, Gettig, Coulson & Shull, Kansas City, for appellant.

John D. Ashcroft, Atty. Gen., Robert Presson, Asst. Atty. Gen., Jefferson City, for respondent.

SEILER, Judge.

In this case, which comes to the writer on recent reassignment, appellant was charged with first degree murder (felony-murder) under § 559.007, RSMo 1975, by an indictment which alleged that he knowingly aided and abetted others in an attempted armed robbery of the North Hills Bank in Clay County, Missouri on March 10, 1976, during which a security guard was fatally shot. The cause was submitted to the jury on first degree (felony) murder, § 559.007; conventional second degree murder, § 559.-020, RSMo 1969; and voluntary manslaughter, § 559.070, RSMo 1969. Appellant was convicted of second degree murder, and, the jury not being able to agree upon punishment, was sentenced by the judge to 55 years confinement. He appealed to the western district of the court of appeals, which reversed, concluding that second degree murder is not a lesser included offense of felony murder, the crime with which defendant was charged. Believing that the same reasons which prevented conviction of defendant for second degree murder prevented conviction for manslaughter, the court of appeals transferred the cause to this court because of the general interest and importance of the principal issues and corollary questions involved.

Appellant was not present during the attempted robbery of the North Hills Bank by three armed men, which occurred at about 10:45 a. m. on March 10, 1976. His alleged involvement occurred prior to that time. In January and February of 1976 James Falkner, who masterminded the robbery plan, recruited appellant's brother and certain other men for the scheme. With them he "cased" the bank and made plans for the robbery and escape. Falkner first contacted Handley on March 7, 1976, at which time he asked that appellant steal an automobile. On March 8, Falkner asked appellant to steal a second automobile. While Handley was able to fill Falkner's "order" for one such automobile but not the second, in neither instance was he told the purpose for which the stolen vehicle would be used.

On the morning of the abortive robbery attempt, Handley and a friend named Ed went to an apartment on Troost Avenue in mid-Kansas City pursuant to Falkner's request that they help him with "something". Falkner did not elucidate, and at this point Handley still knew nothing about the robbery plans. Handley first learned of them that morning, as he heard Falkner brief the three men who were to execute the scheme as to their assignments and watched final preparations being made. At Falkner's behest, Handley and Ed then used Ed's car to help deliver guns and masks to another apartment on Paseo Boulevard in mid-Kansas City, where the others changed into their overalls. When preparations were complete, all the men drove in a four-car caravan, including two stolen vehicles, to the "jumping-off" point in Clay County. Ed's car, in which Handley was a passenger, brought up the rear and after proceeding about one block, one of the drivers honked his horn and the four cars pulled over. Handley reported to Falkner that the driver of the third car was not driving properly. The two men in that car changed places that the other might drive, and the caravan resumed its trek. The entourage arrived at a "parking lot of the Waterworks Department," north of the Missouri River, where the stolen Buick was parked as a getaway vehicle and its two occupants joined the driver of the stolen LTD. The LTD then proceeded to the North Hills Bank while the other two cars, including the one in which Handley was riding, left the parking lot and returned to midtown Kansas City.

The three armed would-be robbers burst into the lobby of the North Hills Bank in Kansas City, north of the Missouri River (Clay County), and one of them shouted, "Everybody freeze, hit the floor!" Gunfire erupted. Fifteen to twenty shots were fired before the robbers fled, *sans* loot, leaving a mortally wounded bank guard who died about five hours later. *The facts do not show who fired the fatal bullets.*

Falkner testified on cross-examination that the presence of the security officer at the bank was totally unexpected and that no shooting was contemplated or mentioned when plans for robbing the bank were discussed.

There was no plan for Handley and "Ed" to return to the Paseo apartment, but they did so later that day. By that time, the robbers had returned from their unsuccessful foray into the bank and Handley asked where the money was. After being told there was none, he left with "Ed". At no time did the planning of the robbery include a split of the bank money for Handley; rather, he was to be paid a fee for stealing the LTD whenever Falkner had the money. Falkner made no mention of Handley as a participant when he turned state's evidence and gave a detailed confession in return for a 15-year sentence.

Appellant makes numerous allegations of error. Because of our resolution of this case, we need address only three. First, appellant alleges that the court erred in failing to grant his motion for judgment of acquittal in that there was insufficient evidence to show that he aided and abetted in the perpetration of the robbery or homicide. Second, he alleges error in submitting the second degree murder instruction. Third, he alleges that he should be discharged rather than remanded for a new trial on manslaughter because neither the facts nor the law support a conviction for manslaughter.

I.

Although appellant was not present during the robbery and was never to have received any of the proceeds therefrom, the state points to several separate circumstances demonstrating appellant's active participation in the criminal enterprise, the first of which is the theft of the car. By its uncontradicted evidence the state showed that Handley did not know at the time he stole the car what its use would be and it cannot be said that he then intended to assist in the robbery scheme by means of the auto theft. His complicity cannot be based on that act. *See State v. Strawther*, 476 S.W.2d 576, 581 (Mo.1972).

Next, the state relies on Handley's presence during the final briefing session and preparations for the robbery; on his presence in the car in which weapons and disguises were ferried from the Troost apartment to the Paseo apartment building prior to the robbery; and on his unexpected arrival at the apartment of one of the robbers after the abortive robbery attempt, when he asked if there was any money. While these facts demonstrate knowledge of the criminal purpose, Handley's presence, without more, does not prove his participation. *State v. Irby*, 423 S.W.2d 800, 803 (Mo.1968).

However, these facts may properly be considered with other evidence in determining the question of participation. *State v. Reed*, 453 S.W.2d 946, 948–49 (Mo.1970). Viewed in this light, we find appellant willingly joining the caravan which had as its intended goal the bank robbery and while en route to Clay County telling Falkner that one of the drivers was having difficulty with the third car. *United States v. Hill*, 464 F.2d 1287 (8th Cir.1972), has been cited in which the prosecution showed defendant's presence at a planning session for the crime, her nodded assent to the plan, and her presence with the conspirators when the robbery was thwarted. The appellate court ruled that a submissible case of aiding and abetting had not been made. Although *Hill* seems similar to the facts before us, given the totality of the circumstances—attending the final planning session, riding in the car ferrying weapons and disguises, acquiescence in the use of the stolen car in the felonious activity and finally assistance during the trip to the jump-off point during which appellant reported the inability of one of the drivers to carry out his assigned task, and considering all evidence and inferences favorable to the prosecution, *Reed*, 453 S.W.2d at 949, we find defendant's actions constituted sufficient participation in the criminal enterprise to make a submissible case of aiding and abetting the robbery, although the jury did not find defendant guilty of doing so.

1. Section 559.010, RSMo 1969 defined first degree murder as follows:

II.

Appellant next attacks the submission of second degree murder to the jury, asserting that because the felony-murder indictment did not include a charge of second degree murder, he was impermissibly convicted of a crime of which he had not been accused. We agree.

Article I, § 17 of the Missouri Constitution guarantees "That no person shall be prosecuted criminally for felony or misdemeanor otherwise than by indictment or information . . ." The protection of this constitutional section renders any conviction for a crime not charged or necessarily included in the underlying indictment or information a nullity. "There can be no trial, conviction or punishment for a crime without a formal and sufficient accusation." *State v. McKinley*, 341 Mo. 1186, 111 S.W.2d 115, 118 (1937). A court is without jurisdiction to try a person for an offense unless the offense has been charged by information or indictment. See *State v. Barrett*, 332 Mo. 1020, 44 S.W.2d 76, 78 (1931). To do so would violate a defendant's due process rights, *Cole v. Arkansas*, 333 U.S. 196, 201, 68 S.Ct. 514, 92 L.Ed. 644 (1948), *cert. granted after remand*, 337 U.S. 929, 69 S.Ct. 1496, 93 L.Ed. 1737 (1949), *aff'd* 338 U.S. 345, 70 S.Ct. 172, 94 L.Ed. 155 (1949); *Presnell v. Georgia*, 439 U.S. 14, 99 S.Ct. 235, 236, 58 L.Ed.2d 207 (1978).

Although the state has referred us to cases such as *State v. Williams,* 529 S.W.2d 883 (Mo.banc 1975), and *State v. Jewell*, 473 S.W.2d 734 (Mo.1971), in which "instructing down" to murder second was permitted, we do not find them controlling on the issue here, for they were decided on charges filed under the murder statutes in force prior to September 28, 1975. Before that date, the proscription of the then "first degree murder" statute, § 559.010, RSMo 1969, broadly included both "common form" first degree murder and "felony" first degree murder.[1] On September 28, 1975, and

"Every murder which shall be committed by means of poison, or by lying in wait, or by

thereafter, "common form" first degree murder was separated from "felony-murder first degree" and was designated "capital murder". The new section, 559.005, RSMo Supp.1975 (now revised in § 565.001, RSMo 1978) provided, "A person is guilty of capital murder if he unlawfully, willfully, knowingly, deliberately, and with premeditation kills or causes the killing of a human being." On the other hand, that portion of former § 559.010 traditionally described as "felony" first degree murder was isolated on September 28, 1975, and "felony-murder first degree" became the only homicide remaining in the class designated "first degree murder," § 559.007 (now revised in § 565.003, RSMo Supp.1977).[2] Thus a distinct new crime of "first degree murder", was created, the elements of which appear in the statutory definition: (1) the unlawful killing (2) of a human being (3) committed in the perpetration of or in the attempt to perpetrate (4) one of the five named felonies.

Common form second degree murder was then and is presently described in the statute as follows: "All other kinds of murder at common law, not herein declared to be manslaughter or justifiable or excusable homicide, shall be deemed murder in the second degree." Section 559.020, RSMo 1969. The elements of "common form" second degree murder which were here submitted to the jury over appellant's objections have been stated thus: (1) willful, (2) premeditated, (3) killing (4) of a human being (5) with malice aforethought. *State v. Franco*, 544 S.W.2d 533, 535 (Mo.banc 1976), *cert. denied*, 431 U.S. 957, 97 S.Ct. 2682, 53 L.Ed.2d 275 (1977). A comparison of the elements of "common form" second degree murder with those of the then new

"first degree murder" under § 559.007 shows that the latter clearly do not contain the former. "[A]ll legal and factual averments necessary to sustain a conviction for a lesser included offense must also be elements of the greater offense." *Hayes v. State*, 501 S.W.2d 508, 511 (Mo.App.1973). *See also State v. Amsden*, 299 S.W.2d 498, 504 (Mo.1957). Thus "common form" second degree murder (§ 559.020) is not a lesser included offense of "first degree felony-murder" under § 559.007 because the latter does not include the elements of willfulness, premeditation, or malice aforethought, each of which are necessary for "common form" second degree murder. Accordingly, as the indictment did not charge common form second degree murder, the court was without jurisdiction to submit such crime for the jury's consideration.

Further, the conviction cannot be saved by the provisions of the then in force subsection 559.009.2, RSMo Supp.1975. Section 559.009.2 states:

"Upon the trial of an indictment or information for murder in the first degree, the jury must inquire under such instructions as the court finds are justified by the evidence, and by their verdict ascertain, whether the defendant is guilty of murder in the first degree, murder in the second degree, or manslaughter."

■ Notwithstanding the language of this subsection, its terms are unenforceable because the legislature cannot, in view of the constitutional protection against that abuse, contained in art. I, § 17 and in the due process clauses of Mo.Const., art. I, § 10, and the 14th amendment to the United States constitution, bestow jurisdiction

---

any other kind of willful, deliberate and premeditated killing, and every homicide which shall be committed in the perpetration or attempt to perpetrate any arson, rape, robbery, burglary or mayhem, shall be deemed murder in the first degree."

**2.** Under the 1975 and 1977 "first degree murder" statutes kidnapping replaced mayhem as one of the five felonies which when linked with an "unlawful killing" constitutes murder first degree.

Section 559.007, RSMo.Supp.1975 defined first degree murder as follows:

"The unlawful killing of a human being when committed without a premeditated intent to cause the death of a particular individual but when committed in the perpetration of or in the attempt to perpetrate arson, rape, robbery, burglary, or kidnapping is murder in the first degree."

upon the courts to try persons for offenses not charged. The statutory command to submit second degree murder (if warranted by the evidence) when "first degree murder" is charged is, in this instance, constitutionally impermissible. For these reasons and for the reason, noted *infra*, that conviction of second degree murder was not warranted by the evidence, the judgment of conviction must be reversed.

### III.

We must now consider whether appellant may be remanded for a new trial on manslaughter. Under the facts of this case, we conclude not.

■ In order to be guilty as an aider and abetter of manslaughter, one must *knowingly* and *intentionally aid and abet* the assault which resulted in the death of the victim, *State v. Grebe*, 461 S.W.2d 265 (Mo. banc 1970); LaFave and Scott, Criminal Law, Ch. 6, § 64 at 506 (1972). This distinguishes manslaughter from first degree murder (felony-murder) in which knowingly and intentionally aiding and abetting only the robbery would suffice for conviction because of the strict liability imposed by the felony rule.

■ Here, the record is devoid of any evidence which would indicate that appellant intentionally aided and abetted the assault on the guard. He was not even at the bank when the shooting occurred, and did not know a guard had died or who killed the guard. He cannot have had a specific intent to aid and abet the assault or death of a particular individual he did not know existed, during a robbery at which he was not present and in which the jury found he did not aid, by a person he did not know was performing the act. Thus, the intent to aid and abet the manslaughter required by *Grebe* must be supplied, if at all, by proof that appellant knowingly and intentionally aided and abetted a crime the natural and probable consequence of which was the death of the guard. The state's evi-

dence as to such intentional aiding and abetting was, however, rejected by the jury and cannot now be supplied.

By convicting appellant of second degree murder, the jury implicitly acquitted him of felony-murder. *Price v. Georgia*, 398 U.S. 323, 326–28, 90 S.Ct. 1757, 26 L.Ed.2d 300 (1970); *Green v. United States*, 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957); *State v. Favell*, 536 S.W.2d 47, 51 (Mo.App. 1976).

The evidence is undisputed that Falkner's three henchmen, masked and armed, burst into the bank with the intention of staging a robbery, commanded everyone to "freeze" and put the victims in fear. Once inside the bank lobby the unexpected presence of a bank guard seated at a desk brought about shooting. There was an exchange of gunfire, much breaking of glass, the guard was fatally wounded, and the gunmen fled. In both opening and closing argument to the jury the state stressed that the only defense offered was whether or not defendant aided or encouraged the commission of the robbery. Against this factual background, there is only one basis upon which the jury could have implicitly acquitted defendant of felony-murder, under the instructions given: it did not believe beyond a reasonable doubt that appellant's acts constituted aiding and abetting the robbery. That this is the only basis is apparent from the evidence and from a reading of instruction No. 8, which states:

"If you do not find and believe from the evidence beyond a reasonable doubt that the defendant aided and encouraged the attempted robbery then you must find the defendant not guilty."

This was a converse to instruction No. 5, the felony murder instruction.[3] By finding appellant not guilty of felony-murder, the jury necessarily did not believe beyond a reasonable doubt that defendant aided and encouraged the attempted robbery.

---

3. Instruction No. 8 does not refer specifically to instruction No. 5. However, the latter is the only instruction which refers to the robbery.

Since a converse instruction must converse something, it necessarily was a converse to instruction No. 5.

However, if appellant did not aid and abet the robbery then, under these facts, he cannot be guilty of manslaughter. The alleged aiding and abetting of the robbery attempt is the umbilical cord that connects the appellant to the killing. The jury cut that cord when it found the appellant not guilty of the felony-murder and consequently there is no connecting cord left, under the facts and evidence of this case, between defendant and whatever took place at the robbery scene so as to provide any basis for a conviction of manslaughter.

We note that, *a fortiori*, the same is true as to second degree murder: defendant either factually aided in the robbery or he did not factually aid in the robbery. If he did not, as a matter of fact, aid in the robbery (as found by the jury), then under the evidence in this case he did not, in fact, aid in anything that took place at the bank, including the killing of the guard, intentionally or otherwise. It is the jury's rejection of the necessary underlying facts proving aiding and abetting by its acquittal on first degree (felony) murder that precludes conviction of a crime which would require the acceptance of these facts.

This aspect distinguishes the present case from *State v. Chernick*, 278 S.W.2d 741 (Mo.1955). Chernick was convicted of assault with intent to kill with respect to the wounding of a police officer during a gun fight in a bank robbery. Chernick was not actually inside the bank, did none of the shooting, and the state did not contend he participated in the actual robbery. He was the outside man waiting in the getaway car. Nevertheless, he could be convicted of the assault on the officer under the rule stated that one who joins in a purpose with another to commit a crime [bank robbery] is also guilty of any other crime [assault] committed by the other as a natural or probable consequence of the robbery or attempted robbery. *Id.* at 746. As we know from examining the original file in this court, instruction No. 1 in the *Chernick* case, submitting the issue of defendant's guilt, required the jury to find that Chernick by his presence at or near the bank "did aid, abet, assist or encourage" the three others ·"to

feloniously hold up or rob" the bank and "as a part of and in furtherance of said holdup or robbery" did by his presence aid and abet the others to make an assault upon the police officer by shooting him. The state argued to the jury: "Under the instructions that have been given, if you find that there was a holdup and that the defendant participated in the holdup, then you are entitled to find him guilty of assault with intent to kill, because the assault was committed in connection with the holdup; that's the instruction."

The jury convicted the defendant, but a new trial was ordered on appeal because of admission of hearsay testimony. In addressing the retrial, the court said: "Upon retrial the submission should be restudied and the instruction redrafted so as to obviate the possible criticism that the instruction assumed and did not submit to the jury that defendant was present and aiding and abetting." *Id.* at 748. In other words, to convict of assault, the jury must find, under a properly drafted instruction, that defendant was present and aided and abetted in the initial crime, the bank robbery. Otherwise defendant would not be in the position of having aided and abetted the others in a particular crime [robbery] of which the assault was the natural or probable result. The connection would be broken. In the case at bar, the effect of the acquittal on the felony-murder charge was a finding by the jury that defendant was not guilty of aiding and abetting in the attempted bank robbery (whereas the jury did find as a fact that Chernick was aiding and abetting the others in the bank robbery) and hence defendant, who admittedly was not present at or near the scene, was guilty of no crime committed by the others of which the death of the bank guard was the natural and probable consequence.

■ The state cannot have a second "bite of the apple", and try to convince a new jury, on remand, that defendant's acts did constitute aiding and abetting the attempted robbery. As a result of the rule in *Ashe v. Swenson*, 397 U.S. 436, 443–47, 90 S.Ct.

1189, 25 L.Ed.2d 469 (1970), to remand for this purpose would constitute double jeopardy and thus is forbidden. In *Ashe*, the defendant was suspected of robbing six poker players, to which his only real defense was alibi. He was tried for the robbery of one of the players and acquitted. The state then tried him for the robbery of a second player, of which he was convicted. The United States Supreme Court reversed, stating that the only basis on which the first jury could have acquitted him was that it believed defendant was not present during the crime. The Supreme Court concluded that to submit the issue of his presence at the crime to the second jury constituted double jeopardy, and the state was collaterally estopped from so doing. It admonished that collateral estoppel is not to be determined hypertechnically, but rather that we are to conclude "whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." *Id.* at 444 and n. 9, 90 S.Ct. at 1194 and n. 9.

So here, the state cannot re-litigate whether appellant aided and abetted the attempted robbery. As a result, appellant must be discharged because there was insufficient evidence to sustain a conviction of second degree murder or manslaughter, *Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978). In *Burks*, the United States Supreme Court held that "the Double Jeopardy Clause precludes a second trial once the reviewing court has found the evidence legally insufficient," and hence overturned the defendant's conviction, *id.* at 18, 98 S.Ct. at 2150. It follows that, where, as here, nothing appears which could show the required specific intent for aiding and abetting the homicide (once felony-murder is out of the case), and there being no way to supply the deficiency under the undisputed facts, the case should not be remanded for a new trial. "[T]he only 'just' remedy available for [this] court is the direction of a judgment of acquittal." *Burks v. United States*, 437 U.S. at 18, 98 S.Ct. at 2150.

Consequently, we reverse the judgment of the trial court and order that the defendant be discharged.

BARDGETT, C. J., concurs in separate concurring opinion.

DONNELLY, J., concurs in result in separate opinion.

FINCH, Senior Judge, concurs in result.

RENDLEN and MORGAN, JJ., dissent in separate dissenting opinions.

HOUSER, Senior Judge, not participating.

WELLIVER, J., not participating because not a member of the court when cause was submitted.

BARDGETT, Chief Justice, concurring.

I concur in parts I and III and in the result reached by the principal opinion. As to part II, I am not certain that murder in the second degree or manslaughter can never be submitted upon a trial for first-degree (felony) murder. On the facts of this case—the defendant not being present at all and his culpability totally depending upon whether he aided and abetted the robbery—I agree that murder in the second degree was not submissible nor was there evidence sufficient to support such a conviction. Prosecutors should bear this case in mind so that, if they intend to submit on second-degree murder or manslaughter where the highest charge is first-degree (felony) murder, it would be well to specifically charge murder in the second degree as a separate count.

DONNELLY, Judge, concurring in result.

In *Duncan v. Louisiana*, 391 U.S. 145, 157, 88 S.Ct. 1444, 1452, 20 L.Ed.2d 491 (1968), the United States Supreme Court held that the Sixth Amendment right to trial by jury applies to State criminal prosecutions, and cited with approval a study which had concluded "that juries do understand the evidence and come to sound conclusions in most of the cases presented to them and that when juries differ with the result at which the judge would have arrived, it is

usually because they are serving some of the very purposes for which they were created and for which they are now employed."

In *Jackson v. Virginia*, —— U.S. ——, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the United States Supreme Court rejected the presumption that trial juries will act rationally and held "that in ´a challenge to a state criminal conviction brought under 28 U.S.C. § 2254—if the settled procedural prerequisites for such a claim have otherwise been satisfied—the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no *rational* trier of fact could have found proof of guilt beyond a reasonable doubt." (Emphasis mine). Despite the Court's disclaimers, recent history teaches us in Missouri that the Court's use of the word *rational* gives a federal court carte blanche to substitute its view of guilt or innocence for that of the trial jury. *See Antonio v. Kirkpatrick*, 453 F.Supp. 1161, 1170 (D.C.1978); *Antonio v. Kirkpatrick*, 579 F.2d 1147, 1151 (8th Cir., 1978).

How does one explain this patent contradiction?

Why did the Court retreat from *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 30, 37, 49 L.Ed.2d 1067 (1976), and return to the practice of injecting the federal judiciary into the administration of justice in the States?

In the words of Mr. Justice Brennan, "[i]t was in the years from 1962 to 1969 that the face of the law changed." William J. Brennan, Jr., *State Constitutions and the Protection of Individual Rights*, 90 Harvard Law Review 489, 493 (1977). *See Robinson v. California*, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962) (*See* Mo.Const. Art. I, § 21); *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (*See* Mo. Const. Art. I, § 18(a)); *Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964) (*See* Mo.Const. Art. I, § 19); *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965) (*See* Mo.Const. Art. I, § 18(a)); *Klopfer v. North Carolina*, 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967) (*See* Mo.Const. Art. I, § 18(a)); *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967) (*See* Mo.Const. Art. I, § 18(a)); *Duncan v. Louisiana, supra* (*See* Mo.Const. Art. I, § 18(a)); *Benton v. Maryland*, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969) (*See* Mo.Const. Art. I, § 19).

It has been suggested that the Court's "assault upon the legal order by moral imperatives" may have contributed to the excesses of the Nixon Presidency and Watergate. *See* Alexander M. Bickel, *The Morality of Consent* 120–123 (New Haven: Yale University Press, 1975). The suggestion may be accurate. It is a fact that at some point in time after World War II the Supreme Court of the United States ceased to function as a court. It molded itself into an organ for control of social policy and made that policy effectual by utilization of the Fourteenth Amendment to amend the Constitution according to the predilections of its majority. (Cf. Article V of the Constitution). I have no right to question the motivation or good faith of its majority or its desire "to do good things." I do question the wisdom of its derogating "the rule of law" as a viable concept and its creating a climate in which the leaders of another department of government could come to believe that there are no legal limits to the exercise of arbitrary power and no ultimate responsibility to the governed. *See* Robert H. Jackson, *The Struggle for Judicial Supremacy: A Study of a Crisis in American Political Power* 322 (New York: Knopf, 1941); Charles H. McIllwain, *Constitutionalism: Ancient and Modern* 146 (Ithaca: Cornell University Press, 1947).

In 1978, Professor Tribe of Harvard University posed the question whether "the Constitution is only and always what the Supreme Court says it is." *See Cooper v. Aaron*, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958). He expressed the belief that "despite the growth of federal judicial power, the Constitution remains a fundamentally democratic document, open to competing interpretations limited only by the values which inform the Constitution's provisions themselves, and by the complex political process that the Constitution creates—a

process which on various occasions gives the Supreme Court, Congress, the President, or the states, the last word in constitutional debate." Laurence H. Tribe, *American Constitutional Law* 32, 33 (Mineola, N.Y.: The Foundation Press, 1978). I agree with Professor Tribe. We now know that the Supreme Court does not. *North Carolina v. Butler,* —— U.S. ——, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979).

*To sum up*: (1) "the Constitution is only and always what the Supreme Court says it is"; (2) no deviations will be tolerated; and (3) the lower federal courts will implement the Court's policies through 28 U.S.C. §§ 1343, 2201, 2202 and 2254.

I admit that I am not comfortable with all of this. To borrow again from Professor Tribe: " * * * I do not regard the rulings of the Supreme Court as synonymous with constitutional truth. As Justice Robert Jackson once observed of the Court, 'We are not final because we are infallible, but we are infallible only because we are final.' And the Courts that held slaves to be non-persons, separate to be equal, and pregnancy to be non sex-related can hardly be deemed either final *or* infallible. Such passing finality as judicial pronouncements possess is an essential compromise between constitutional order and chaos: the Constitution is an intentionally incomplete, often deliberately indeterminate structure for the participatory evolution of political ideals and governmental practices. This process cannot be the special province of any single entity." Tribe, *supra,* at iii.

To turn to the case before us: the principal opinion, although sufficiency of evidence is an issue throughout the case, does not mention the *Jackson* rule. I agree that the judgment of conviction must be reversed and the defendant discharged. I also believe that we should address the question whether the *Jackson* rule must be applied in our state appellate courts on direct appeal and on transfer. *See* Article VI, Constitution of the United States.

What is to be the fate of Rule 27.26? Rule 27.26 was amended by this Court in 1967 in response to *Fay v. Noia,* 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963), so as to provide a meaningful state post-conviction remedy and for the purpose of eliminating any excuse for the federal judiciary to meddle in the administration of criminal justice in Missouri under the mantle of 28 U.S.C. § 2254. On reflection, we must recognize that we provided a viable state post-conviction remedy but that we failed dismally in our attempt to ward off the federal judiciary, particularly now that federal judges have been authorized by *Jackson, supra,* to decide whether Missouri trial juries have acted *rationally* in finding an accused guilty beyond a reasonable doubt—to effectually function as a super-jury.

I would amend Rule 27.26 and restrict its provisions to claims of violations of the Constitution of Missouri. I submit that it is no longer excusable conduct for this Court to continue to "impose countless * * * hours of unproductive labor" (*Jackson, supra,* —— U.S. at ——, 99 S.Ct. at 2799) (Stevens, J., dissenting) on the judges of Missouri.

I concur only in the result.

RENDLEN, Judge, dissenting.

At the outset it must be stated that I have little quarrel with the majority opinion's section I or most of section II, and further that the cause was not reassigned to its present author because of any disagreement with the interpretation of case law and statutes contained therein. However, section III of the majority opinion effects changes in the law, the full import of which are neither legally justifiable nor fully described therein.

*State v. Chernick,* 278 S.W.2d 741, 746 (Mo.1955), unequivocally states that if two or more persons join to commit a crime, each may be liable for any other crime committed by one of their company "in pursuance of the common purpose, or as a natural or probable consequence thereof." *Accord, State v. Paxton,* 453 S.W.2d 923 (Mo.1970); *State v. Tolias,* 326 S.W.2d 329 (Mo.1959); *State v. Sneed,* 549 S.W.2d 105 (Mo.App.1977); *State v. Williams,* 522

S.W.2d 327 (Mo.App.1975); *State v. Brooks,* 513 S.W.2d 168 (Mo.App.1973). In this case the preparations for the raid on the bank included wiping down and cleaning the firearms intended for use in the armed robbery. Handley not only witnessed and participated in the early phases of the operation but afterward helped deliver the weapons to another location. He then assisted in transporting the men and weapons toward the intended place of the armed robbery. The shooting of *someone* at the bank was indisputably a "natural or probable consequence" of the criminal activity in which Handley participated and it is of no moment it happened to be an "unexpected" bank guard who was ultimately shot. Hence under the authorities, Handley could validly have been convicted of second degree murder had it been charged in the indictment or substituted information. From this it must be said his conviction fails only because of a pleading deficiency. I save the *Ashe v. Swenson* estoppel and harassment issue for the moment.

The majority opinion, citing *State v. Grebe,* 461 S.W.2d 265 (Mo. banc 1970), announces in effect that one must knowingly aid and abet the homicide directly in order to be held accountable for it and that because Handley was "not even at the bank when the shooting occurred, and did not know a guard had died or who killed the guard . . . [h]e cannot have had a specific intent to aid and abet the assault or death of a particular individual . . . ." This statement contradicts the rule of *Chernick* and other authorities cited above and *Grebe* is inapposite because there the question of the foreseeability of felonious assault stemming from a planned robbery did not enter the case. In *Grebe,* defendant's son fatally stabbed the victim during an altercation which also involved defendant and the victim's son. The defendant herself was unarmed, but her son had a knife and had inflicted a non-mortal wound on the victim's son just before turning his attention to the victim. Defendant was grappling with the victim when the stabbing of the victim occurred. The question was whether the evidence sufficiently supported a finding that defendant intentionally aided and abetted the fatal stabbing, an evidentiary question answered by this Court in the affirmative. However, *Grebe* did not involve the question *Chernick* addressed, *i. e.,* the substantive liability of an aider and abetter who, as here, was shown by the evidence to have participated in planning an armed robbery for the subsequent crime (homicide) when his intentional participation in the robbery has been established by the evidence. The majority thus, quite without logical justification, implicitly overrules many prior decisions by citing *Grebe,* a case wherein the dispositive facts are distinguishable from those decisions and cannot properly be said to relate to the principles for which they stand.

This brings us to the majority's assertion that the jury's acquittal on the felony murder charge meant the jury found Handley did not participate in the attempted robbery. As the majority puts it, "The alleged aiding and abetting of the robbery attempt is the umbilical cord that connects the appellant to the killing. The jury cut that cord when it found the appellant not guilty of the felony-murder . . . ." In so doing the majority disregards the verdict of guilty of second degree murder, which must have been predicated on the jury's finding that Handley aided and abetted the criminal enterprise.[1] It is simply not correct to state that Handley, who stands convicted of murder second degree (albeit invalidly because of the pleading anomaly) was acquitted of aiding and abetting, and *Ashe v.*

---

1. The majority argues that appellant's converse instruction referred only to the felony murder instruction because only in the felony murder instruction was a "robbery" referred to. However, it is important to note that the second degree murder instruction required the jury to find that "the defendant knowingly and intentionally aided or encouraged the persons who engaged in the conduct" constituting the second-degree murder. Thus the jury's verdict of guilty on this charge, if we are to engage in parsing it, necessarily meant finding that Handley participated in something which aided in the killing and that something was the attempted robbery.

*Swenson,* 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1969), is inapposite. At most there is presented the question of an inconsistent verdict to which *Ashe* does not apply.

The facts of *Ashe* bear iteration. Six poker players were robbed while at their game. The State first prosecuted Ashe for the robbery of one of the players and the jury acquitted him, the Supreme Court of the United States saying of this first trial, "The single rationally conceivable issue in dispute before the jury was whether the petitioner had been one of the robbers. And the jury by its verdict found that he had not." 397 U.S. at 445, 90 S.Ct. at 1195. The State then prosecuted Ashe for the robbery of one of the remaining poker players, and that conviction was ultimately voided on the ground that collateral estoppel, as part of the fifth amendment guarantee against double jeopardy, forbade the second prosecution, "after a jury determined by its verdict [in the first trial] that the petitioner was not one of the robbers." *Id.* at 446, 90 S.Ct. at 1195. An unequivocal acquittal had been rendered by the jury for the first crime and in that trial the defense was alibi; "identity" was the only issue. It was the subsequent trial for different crimes, more particularly the robbery of a *different* person from the same poker game which the court considered harassment and invoked the doctrine of estoppel. Handley could thus on remand properly be tried for manslaughter of the *same* bank guard which is not a separate crime but a lesser included offense of the principal crime charged, as I discuss below. The guilty verdict on the second degree murder charge represents a finding of fact adverse to the application of collateral estoppel because unlike Ashe who had been squarely acquitted, Handley was convicted of murder in the second degree for the killing of the *same* bank guard for which he must now be retried for manslaughter. In *State v. Akers,* 278 Mo. 368, 213 S.W. 424 (1919), the jury rendered verdicts of guilty on Count I of an information and of not guilty of Count II, but on examination the two counts were found to have charged the same crime in almost identical words. This Court found the judgment "too contradictory to support a judgment of conviction," but likewise "too inconsistent to support a judgment of acquittal." The double jeopardy clause of the Missouri Constitution was held inapplicable and the case was remanded for new trial because the verdicts "are too contradictory to be considered a verdict either of conviction or acquittal." In the same vein, this Court held in *State v. Cline,* 447 S.W.2d 538, 543–44 (Mo. banc 1969), that a conviction of burglarious stealing could not stand when the jury simultaneously rendered a not guilty verdict on the underlying burglary. Citing *Akers,* the *Cline* court ruled the verdict was "incomplete and sufficiently ambiguous and confusing as to be insufficient to support either a judgment of conviction or acquittal. The verdict did not acquit defendant of burglary and he is not entitled to be discharged on the theory that it did." The court concluded that a retrial would *not* offend the protection against double jeopardy because "there has been no acquittal of burglary and hence no question of double jeopardy arises." The same holds true of the "acquittal" the majority finds for Handley: assuming arguendo that by its acquittal of felony murder the jury found Handley did not aid and abet the armed robbery, nevertheless by its guilty verdict on second degree murder it necessarily (and inconsistently) found Handley *did* aid and abet the armed robbery for the only evidence of his connection with the killing was his willing participation in and intentional contribution to the armed robbery attempt and this assistance aided in the killing which was a foreseeable consequence of the entire enterprise. The jury thus can be said to have concluded from the evidence that by his actions (as submitted in the murder second degree instruction) "defendant knowingly and intentionally aided or encouraged the persons who engaged . . ." in the shooting and killing of Warren G. Jackson. The jury in effect found that the participation in the planning of, preparation for and partial participation in the robbery attempt

constituted the knowing and intentional aiding and encouraging of the killing. In *State v. Jewell,* 473 S.W.2d 734, 738 (Mo. 1971), a murder second degree conviction was upheld under a felony murder charge on evidence that defendant had participated in a burglary during which the victim had been murdered. The court there held, 473 S.W.2d at 738, "[I]f the killing is committed during the actual or attempted perpetration of one of the felonies enumerated in Section 559.010, proof of the underlying felony stands in lieu of and is the equivalent of the necessary malice, premeditation, and deliberation and is tantamount to proof of first-degree murder." Though *Jewell* and similar decisions of this Court are not controlling today in light of the change in the murder first degree statute discussed in the majority opinion, the evidence here clearly was supportive of the murder second degree conviction, and only because defendant was not "charged" with that crime under the new (1975) murder first degree statute was the murder second degree submission improper. It is for that reason and that reason only the conviction for murder second degree should be reversed. Stated otherwise the proof sufficed for the conviction under the instruction given but the "pleadings" do not support the submission.

As the federal appellate court for the 8th circuit has stated, "It is clear that prior acquittal [for a closely related but different crime] was . . . the linchpin of the *Ashe* decision, leading directly to and serving as the foundation for the 'collateral estoppel' doctrine applied." *Moton v. Swenson,* 488 F.2d 1060, 1062 (8th Cir. 1973), *cert. denied* 417 U.S. 957, 94 S.Ct. 3086, 41 L.Ed.2d 675 (1974). In the case at bar there simply has been no conclusive determination of the fact issue of Handley's aiding and abetting, hence *Ashe v. Swenson* is not controlling.

Although the majority does not explicitly so state, implicit within its opinion is the proposition that *Ashe v. Swenson* does not permit inconsistent verdicts rendered by the same jury to stand as anything but an acquittal, thus estopping the retrial permitted under the Missouri authorities cited

above. This thought has been rejected by numerous federal decisions. For instance, after considering decisions from every federal circuit court of appeals and the Supreme Court upholding validity of convictions even though rendered under inconsistent verdicts, the court of appeals stated in *United States v. Fox,* 140 U.S.App.D.C. 129, 132 n. 22, 433 F.2d 1235, 1238 n. 22 (1970): "[W]e do not understand *Ashe v. Swenson* . . . to mean that one tried for two different but interrelated offenses at the same time must be convicted of both for a conviction of either to stand." Indeed it was the fact of the new charging for separate crimes and a new separate trial (after an earlier acquittal) which led to the reversal in *Ashe v. Swenson.* In *United States v. Greene,* 497 F.2d 1068, 1085–86 (7th Cir. 1974), the Seventh Circuit rejected the argument that *Ashe* affects the legal status of simultaneous inconsistent verdicts. The First Circuit stated in 1977, "The settled rule in· the federal system is that it is the prerogative of the jury *simultaneously* to return inconsistent verdicts. . . . The jury's deliberations have always been regarded as sacrosanct, and the adoption of appellant's proposed exception would undermine the strong policy against probing into the jury's logic or reasoning and would open the door to interminable speculation.[5]" In the footnote, the court added, "The cases appellant relies on . . . involve the very different situation in which a prior jury verdict is held to have a res judicata effect and to bar a *subsequent* prosecution." *United States v. Martorano,* 557 F.2d 1, 9 (1st Cir. 1977) (emphasis in original). The District of Columbia Court of Appeals in *United States v. Smith,* 337 A.2d 499 (1975), refused to apply *Ashe* and its federal predecessors to bar the retrial of a defendant whose first trial ended in an inconsistent result. *See also Hamling v. United States,* 418 U.S. 87, 100–101, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974); *United States v. Miller,* 546 F.2d 320, 325 (9th Cir. 1976); *United States v. Dennett,* 551 F.2d 261 (10th Cir. 1977); *Copening v. United States,* 353 A.2d 305 (D.C.App.1976). I am persuaded by

these authorities, and if the federal courts find no constitutional command from *Ashe* to treat inconsistent verdicts as an acquittal we should be reluctant so to do under the teachings of *North Carolina v. Butler,* —— U.S. ——, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979). Thus I find *Ashe* does not vitiate *State v. Akers* and *State v. Cline.*

Considering now the "pleading" question and whether the cause should be remanded for trial on manslaughter within the scope of the underlying "first degree murder" indictment, it should be noted that the 1975 revisions of the homicide statutes did not change the statutory definition of manslaughter in section 559.070, RSMo 1969, which provides: "Every killing of a human being by the act, procurement or culpable negligence of another, not herein declared to be murder or excusable or justifiable homicide, shall be deemed manslaughter." Manslaughter does not require that a killing be intentional, much less premeditated with malice aforethought. As stated in *State v. Williams,* 442 S.W.2d 61, 64 (Mo. banc 1969), *overruled on another ground, State v. Ayers,* 470 S.W.2d 534 (Mo. banc 1971), "There is but one definition of manslaughter in this state, and that is contained in § 559.070, supra." And we recognized in *State v. Stapleton,* 518 S.W.2d 292, 301 (Mo. banc 1975), "If the jury [does] not find the element of intent to kill, then the defendant [can] still be guilty of manslaughter because manslaughter does not require that element. Sec. 559.070, RSMo 1969."

The first element of the new crime "first degree murder" is an "unlawful killing." It cannot be seriously disputed that the term "unlawful killing" broadly encompasses manslaughter. Section 559.070, which defines manslaughter, excludes every kind of "lawful" killing, that is, all homicides either "excusable" (§ 559.050, RSMo 1969) or "justifiable" (§ 559.040, RSMo 1969).[2]

Those "unlawful killings" that constitute murder are also excluded, leaving all other "unlawful killings" as those constituting the crime of manslaughter. Therefore the "unlawful killing" required for new "first degree murder" includes manslaughter,[3] and it was charged in the indictment returned against Handley. For these reasons I must dissent and would order remand that Handley might be tried for manslaughter without the necessity of filing new charges.

MORGAN, Judge, dissenting.

I respectfully dissent because I belive that "second degree murder" remains as an included offense under a charge predicated on the new "first degree murder" statute, § 559.007, RSMo Supp.1975 (now revised in § 565.003, RSMo Supp.1977).

The forerunner of said statute was § 559.010, RSMo 1969, wherein first degree murder was defined; and, as all agree, it defined in the one statutory provision both "conventional" first degree murder and "felony" first degree murder. In 1977, as discussed in the majority opinion, the two "crimes" were separated in the statutory scheme with the former being in § 565.001 (identified as capital murder) and the latter in § 565.003 (identified as first degree murder). Based thereon, the majority opinion declares that: ". . . a distinct new crime of 'first degree murder' was created . . . ." I disagree. It was, and remains, a crime of "felony" first degree murder bottomed on the long accepted premise that proof of participation in one of the listed "underlying" felonies provides proof of the required felonious mental state.

Nothing would be gained by quoting from *State v. Williams,* 529 S.W.2d 883 (Mo. banc 1975), a representative case, wherein the question was discussed extensively and resolved consistent with this dissent. I concurred therein and now find nothing in any

---

2. The portion of the new criminal code effective January 1, 1979, corresponding to §§ 559.-040 and .050 is revised chap. 563, RSMo Supp. 1977.

3. In determining that remand is proper, I have examined defendant's other allegations of error and find them to be without merit. A full discussion of the points was contained in the original opinion submitted for the court's consideration but their reiteration here would serve no useful purpose.

of the statutory amendments, be they merely re-numbering or otherwise, which necessitate changing the law of this state as delineated therein.