**STATE of Missouri, Respondent,**

v.

**Morris Bruce McCARTY, Appellant.**

**STATE of Missouri, Respondent,**

v.

**Donald G. SCHLUP, a/k/a Stephen M. Ravic, Appellant.**

**Nos. 54498, 54499.**

Supreme Court of Missouri, Division No. 1.

Nov. 9, 1970.

As Modified on Courts Own Motion Nov. 24, 1970.

Motion for Rehearing or to Transfer to Court En Banc Denied in No. 54498, Dec. 14, 1970.

John C. Danforth, Atty. Gen., Warren K. Morgens, Asst. Atty. Gen., Jefferson City, for respondent.

Thomas J. Briegel, Union, for appellants.

HOUSER, Commissioner.

By separate informations filed in separately numbered cases three persons, Morris Bruce McCarty, Donald Gene Schlup (also known as Stephen Michael Ravic), and Rita Marie Moehlman, were charged with burglary second degree and stealing in connection therewith. §§ 560.070, 560.110 and 560.156, RSMo 1959, V.A.M.S. All three charges were alleged to have arisen out of the same transaction. On motion the charges against McCarty and Schlup were consolidated for trial. Tried together they were convicted of both offenses and of previous felonies. Both men were sentenced to 4 years' imprisonment for burglary and three years for stealing, the sentences in both cases to run consecutively. They have conducted separate appeals to this Court. Their court-appointed attorney, Thomas J. Briegel, who diligently and faithfully represented both of them at the trial, has filed separate but identical briefs on their behalf on appeal. The Attorney General has filed separate but identical briefs. Each

of the defendants has filed a *pro se* brief raising numerous points in addition to those raised by his counsel. The cases were argued and submitted together and will be disposed of in one opinion.

From the evidence introduced the jury could find these facts: Sometime between 10:15 p. m. on July 12, 1968 and 5:30 a. m. on July 13, 1968 the building housing Washington Motor Company in Washington, Missouri was forcibly entered and a 300-pound safe 28½ inches in height, 21 inches wide and 21 inches long, containing $157.10 in currency, was removed from the premises. At approximately 5:30 a. m. on July 13 Dr. Kenneth Buchmann, who lived directly across the street from the motor company building, was awakened by a loud, metallic, scraping noise. He arose, looked out the window, saw a white convertible with its top up parked in front of the service door of the motor company building. Two men got in and out of the automobile several times to look at the trunk, the lid of which was up. The two men were "just average size." They could not be more definitely described in detail because "it was still half twilight." In the trunk there was an object the size and shape of a beer cooler, covered with a white cloth or material of some sort. One man took off his gloves and threw them in the car. A third party's hand was observed hanging out the rear window of the automobile. Rita Marie Moehlman, who had been asleep in the back seat, was awakened by a noise, a banging noise which came from the trunk. She felt a movement of the car at the time, or a motion. She felt "something heavy enough" to awaken her. When she woke up the two men tried to get the car started, but it would not start. The two men pushed the car around the corner and out of sight. It finally started. Dr. Buchmann's suspicions aroused, he dressed and followed in his truck. When he arrived at the nearby corner the white convertible was not in sight. Dr. Buchmann telephoned Mr. Bocklage, president of the motor company, who arrived shortly before 6 a. m. to investigate. He found that a restroom win-

dow had been pried open, a door leading to the closet where the safe was kept forcibly broken, and the safe missing. He notified the city police and county sheriff's office, relating what Dr. Buchmann had told him and what he had found.

Between 5 and 5:30 that morning a Mrs. Schriever, who lived three blocks from the motor company, called the police to report that a white car had been parked in the street near her garage; that she saw a man get in the car and drive away, and that thereafter she and her husband found an automobile tire and rim in their yard, near the garage. About 5:15 or 5:30 that morning a Mr. Weseman, a resident of Washington, while walking on the sidewalk alongside the motor company building, saw a gray object 24 inches square and 2½ feet high, on wheels, with a handle on its front door, sitting on the sidewalk next to the building. He did not recognize it as a safe and thought it was a box. He did not notice any people around there at the time, and did not notice any automobile or movement at the place. At approximately 5:50 that morning city police officer Barbarick noticed a strange-looking white 1960 or 1961 model Oldsmobile convertible, the license plate of which was bent so that the numbers could not be read. The officer stopped and found the two appellants and a woman in the car. The men's eyes were "real red." The officer concluded that they had not slept that night. The lid of the trunk was closed. After inquiry and a check of the driver's driving license the men straightened the bent license plate and the officer proceeded on his way without further inquiry. After traveling six blocks Barbarick received a police radio call with the information that there had been a break-in at the motor company and that a white convertible had been seen leaving the scene. Barbarick turned around and his vehicle and the approaching Oldsmobile convertible met and passed each other. Barbarick, who had seen another police car in the vicinity, radioed the other car, telling that officer to turn left and follow the Olds-

mobile "because I think that [is] the car we [want]." Officer Kissinger, driving the other police car, followed the Oldsmobile, which turned west and "started to speed up." Kissinger stopped the Oldsmobile in a private driveway. It was then 6:03 or 6:05 a. m. Barbarick arrived and the two officers searched the persons of the men and had the woman open her purse. The officers saw items of clothing in the trunk, which was then open 2 or 3 inches, but they did not search the car or the trunk. They saw two pairs of gloves in the passenger compartment. The officers placed the three suspects in one of the police cars and told them they were holding them for suspected burglary. The three were taken in the police car to the police station. The Oldsmobile was left in the driveway, locked. Thirty or forty-five minutes later the officers returned to the Oldsmobile and Kissinger drove it to the police station parking lot. Appellants were booked and held in custody, as was the woman.

A deputy sheriff arrived at the motor company about 6:15 a. m. and made an investigation. A restroom window had been forced open. There were pry marks on the outside of the window. The door to the closet where the safe had been kept was broken. There were marks on the painted concrete floor, leading from the closet to a workbench and from there to a service door leading outside. A broken screwdriver and the combination knob from the safe, bent, were found inside the building. Marks on the sidewalk ran from the service entrance alongside the building, and then to the curb. There were deep gouge or scooped-out marks in the asphalt street 3 or 4 feet from the sidewalk. When interrogated at the police station Schlup's eyes were "a little red; red-rimmed" and McCarty's eyes were "watery and bloodshot." Three or four hours after the arrest and between 9 and 10 a. m. the deputy made a visual examination of the Oldsmobile convertible, parked outside in the police station parking lot. First he observed that the trunk lid was open about 3 inches. Inside

the trunk he saw clothing and a piece of white cloth, apparently a bed sheet. Searching more closely he found there was no spare tire in the trunk. There was considerable gray paint on top of the white automobile, paint around the trunk opening, and gray paint smeared or scraped onto the chrome surface of the back bumper. The deputy obtained specimens of the gray paint found on the deck lid opening and rear bumper, placed them in containers and labeled them. He removed two pairs of gloves from the interior of the automobile, which had been on the seats and front floor, and found a pair of pliers. From the trunk and from under the hood he removed 16 electric blasting caps, five fuseholders and a pint-sized jar containing ammonium nitrate dynamite, with nitroglycerin in it. He examined the spare tire and rim which had been brought to the police station from the Schriever home and found that it was the same size, make, tread and rim as were three of the tires on the Oldsmobile, and that all were retreads.

A search warrant, issued by a magistrate that same day authorizing search of this vehicle for items other than those above described, issued in connection with another criminal charge against the occupants of the car, was executed the same day, but the Attorney General does not count on that warrant as authority for the conduct of the search involved in these appeals.

Two days later, on July 15, the safe was found lying in the weeds not far from the railroad depot, 6 or 7 feet from the street. It had not been opened but the combination knob had been knocked off, and a 3-inch steel band one eighth of an inch thick had been "peeled" or pulled away from the body of the safe. The safe had been equipped with a kit of ethyl gas inside as a protective measure. When an attempt is made to "peel" a safe so equipped the gas inside "goes off." For some time thereafter the gas emitted seriously affects the eyes of persons around the safe. The gas in this safe had "gone off" and it was the opinion of Mr. Bocklage that " * * * whoever was working with the safe, got that gas." The man who saw the "box" on the sidewalk on the morning of July 15, called to examine the safe, found it to be similar to the object he saw earlier, indicating that the covering was "crinkly material," not smooth. The deputy took specimens of paint from the gray-painted safe, and observed that some white paint had been scratched onto the dark gray surface of the safe. All of the paint specimens from the vehicle and from the safe were analyzed by an expert at the state highway patrol laboratory. His tests revealed that the gray paint chips from the safe and the gray paint chips found in the trunk of the convertible were of the same type of paint, same color and similar in every detail. Gray paint chips removed from the bumper and body of the convertible bore the same similarities to the gray paint chips from the safe.

Appellants claim there was not sufficient evidence to sustain these convictions of burglary and stealing and that the court erred in failing to direct an acquittal in each case. This point is not pursued in the argument portion of the brief but we consider the point nevertheless, and find from this evidence and the inferences which can reasonably be drawn therefrom that a jury could find that these appellants came to town in possession of the tools of the burglar trade, equipped for burglary and safe-blowing; Reagan v. Commonwealth, 217 Ky. 83, 288 S.W. 1026; Commonwealth v. Johnson, 199 Mass. 55, 85 N.E. 188; State v. Miller, Mo.Sup., 368 S.W.2d 353 and cases cited, l. c. 360 [14]; that they removed and discarded the spare tire to make room for the safe; that they broke into the motor company; tried unsuccessfully to open the safe at the workbench inside the shop; dragged the safe to the Oldsmobile which they had parked near the service entrance; lifted the safe into the trunk of the car, making a dent in the trunk opening and scraping the bumper and surfaces of the car in the process, thereby making the noise heard by Dr. Buchmann

and the jolt felt by the woman passenger of the car; wrapped the safe in a white sheet and made their exit from the scene; that in attempting to peel the safe the ethyl gas was discharged, causing irritation of their eyes; that after they came under surveillance by the police officer concerning the bent license plate incident they abandoned the safe near the railroad depot. Appellant Schlup took the stand and narrated a fanciful, incredible account of the activities of the trio and their dealings with several people whose presence was not corroborated either by the police officers abroad in Washington at the time, or by Mrs. Moehlman, whose testimony fails to verify Schlup's story in important details and supports the state's theory that appellants loaded the safe into the trunk. Although the safe was not found in the trunk its traces were left there. There was enough time for appellants to have disposed of the safe during the 30–35 minute interval between the time they left the scene of the crime and the time of their apprehension. The facts and circumstances shown in evidence are consistent with the guilt of appellants and inconsistent with any reasonable theory of their innocence, and the court did not err in failing to direct a verdict of acquittal.

■ Appellants both make the point that "the items taken and introduced into evidence were the result of an illegal search and seizure and not incident to a lawful arrest." Appellant Schlup, who was not the owner of but was a mere passenger in the automobile, has no standing to object to the search. State v. Cage, Mo.Sup., 452 S.W.2d 125, 128. "A defendant is not permitted to raise the question of an illegal search of someone else's property." State v. Worley, Mo.Sup., 383 S.W.2d 529, 534. We will consider the question in McCarty's appeal, however, because McCarty, having possession of the automobile searched, has standing to raise the question of illegal search and seizure.

McCarty's counsel concedes that there are two situations in which a warrantless search of an automobile may be permitted: (1) where the search is made as an incident to a lawful arrest; (2) where there is probable cause to believe that the automobile contains the fruits of the crime. It is McCarty's position that this case fits into neither category.

■ This search, not made at or near the scene of the arrest contemporaneously or substantially contemporaneously with the arrest but made at the police station after the accused had been looked and safely placed in custody, cannot be justified as a search incident to the arrest. Chambers v. Maroney (1970) 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419; Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777, and State v. Edmondson, Mo.Sup., 379 S.W.2d 486. "Once an accused is under arrest and in custody, then a search made at another place, without a warrant, is simply not incident to the arrest." Preston, supra, 376 U.S., l. c. 367, 84 S.Ct., l. c. 883. And see Heffley v. Hocker (1969) 9 Cir., 420 F.2d 881; Wood v. Crouse (1969) 10 Cir., 417 F.2d 394; Steel v. State (1970) Ark.Sup., 450 S.W.2d 545.

Under the controlling decision of Chambers v. Maroney, supra, however, we rule that the search was justified because the police had probable cause to believe that the automobile contained stolen property which the officers were entitled to seize. Prior to Chambers v. Maroney automobiles stopped upon the public highways could be searched without a warrant, where there was probable cause to believe that they contained articles (contraband) which lawfully could be seized. Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879; Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543, 39 A.L.R. 790. With the advent of Chambers v. Maroney it is now perfectly clear that this doctrine applies also to automobiles which after having been stopped on the streets or highways have been brought to the police station and are held in the custody and control of the police author-

ities, and that the search need not necessarily be for contraband but may be for stolen money or arms used in a robbery. In Chambers v. Maroney, a filling station attendant was robbed of currency taken at gun's point from the cash register. Two teenagers informed the police that a blue compact station wagon had been seen by them speeding away from a parking lot close to the filling station; that four men were in the station wagon and one of them was wearing a green sweater. The filling station attendant told the police that one of the robbers was wearing a green sweater and the other was wearing a trench coat. Acting on this information a description of the car and the two robbers was broadcast over the police radio. A blue compact station wagon containing four men was stopped. The defendant was wearing a green sweater and there was a trench coat in the car. The occupants were arrested and the car was driven to the police station where it was thoroughly searched without a warrant. The incriminating evidence found in the search was held admissible, and the search was ruled justifiable on the ground that "the police had probable cause to believe that the robbers, carrying guns and the fruits of the crime, had fled the scene in a light blue compact station wagon which would be carrying four men one wearing a green sweater and another wearing a trench coat" (399 U.S., 1. c. 47, 90 S.Ct., 1. c. 1979) and probable cause to search the car for guns and stolen money. The Court stressed the constitutional difference between searching houses and searching automobiles, placing great reliance upon the holding in Carroll v. United States, supra, that automobiles may be searched without a warrant in circumstances which would not justify a search of a house or office without a warrant, provided there is probable cause to believe that the automobile contains articles that the officers are entitled to seize; that the right to search and the validity of the seizure are dependent "on the reasonable cause the seizing officer has for belief that the contents of the automobile offend

against the law." 267 U.S., 1. c. 158–159, 45 S.Ct., 1. c. 287. Because the circumstances which furnish probable cause to search a particular automobile for particular articles are most often unforeseeable and the opportunity to search is fleeting because of the mobility of an automobile, the Court reasoned that if an effective search is to be made at any time it must be made either immediately without a warrant, or the car itself must be seized and held without warrant until a search warrant may be obtained; that for constitutional purposes there is no difference between seizing the car before presenting the probable cause to a magistrate and carrying out an immediate search without a warrant. The Court said, "Given probable cause to search, either course is reasonable under the Fourth Amendment," and ruled that the station wagon could have been searched on the spot when it was stopped "since there was probable cause to search and it was a fleeting target for a search"; that probable cause still obtained at the station house and so did the mobility of the car; that in that event " * * * there is little to choose in terms of practical consequences between an immediate search without a warrant and the car's immobilization until a warrant is obtained." 399 U.S., 1. c. 52, 90 S.Ct., 1. c. 1981.

■ In the case before us the police, knowing that a strange 1961 white Oldsmobile convertible containing two men and a woman was abroad at an early hour in Washington and having had the same under surveillance, and having received information by police radio broadcast that "there was a burglary at the Washington Motor and a white convertible was seen leaving the scene," had probable cause to believe that the burglars, carrying burglar tools and the fruits of the crime, had fled the scene in a white convertible which would be carrying two men and a woman, and having seen and stopped the same 1961 white Oldsmobile convertible containing the same two men and woman, had probable cause to search the car for

the instrumentalities of burglary and for whatever was stolen. The convertible could have been searched "on the spot" at the place of arrest because there was probable cause to search and because of its mobility. That probable cause and the mobility of the convertible still obtained at the police station. The officers did not violate constitutional principles in conducting the search, and seizing the articles in question, and the court did not err in overruling the motions to suppress and admitting the exhibits in evidence. Chambers v. Maroney, supra; State v. Speed, Mo.Sup., 458 S.W.2d 301; State v. Fields, Mo.Sup., 458 S.W.2d 342.

The next question is whether the court erred in permitting Rita Marie Moehlman to testify on behalf of the State.

■ Appellants contend that under Criminal Rule 26.07, V.A.M.R., § 546.280, RSMo 1959, V.A.M.S., and State v. Blevins, Mo.Sup., 427 S.W.2d 367, a defendant jointly charged with others cannot testify for the State in a separate trial of his codefendants. This contention is disallowed for the reason that Mrs. Moehlman was not jointly charged as a codefendant with McCarty and Schlup. She was not named in the informations filed against them. She was separately charged. The trial court refused on motion to consolidate her Case No. 6893 with the cases filed against McCarty and Schlup (Nos. 6891 and 6892). Since the witness was not jointly charged with the appellants the rule, statute and decision cited are not applicable. State v. Layton, Mo.Sup., 202 S.W.2d 898 [6], and cases cited, l. c. 900. The rule that one codefendant is incompetent to testify against the other is inapplicable where they are charged in separate informations. State v. Morefield, 342 Mo. 1059, 119 S.W.2d 315; State v. Parker, 324 Mo. 734, 24 S.W.2d 1023.

■ Appellants further contend that under § 491.060, RSMo 1959, V.A.M.S.[1]

Mrs. Moehlman should not have been permitted to testify for the reason that she was mentally incompetent; that counsel requested but was denied permission to place her mother and her attending physician on the stand and to introduce some "records of evaluation" to establish her incompetence; that she was then a patient at State Hospital on Arsenal Street in St. Louis, where she was under treatment for emotional disturbances and was receiving drugs and shock therapy; that she admitted that she had taken drugs within an hour before taking the stand; that she admitted her inability to recall, and that her testimony was incoherent, biased and prejudicial. These contentions are without substance. No medical testimony was offered. No records were produced. Everything sought to be proved by the mother was admitted by Mrs. Moehlman. There was no showing of an adjudication of incompetency or that she was lawfully "confined" at the state hospital or was there in any capacity other than as a voluntary patient receiving treatment. Incapacity was not demonstrated by her testimony, which shows that she was possessed of sufficient mind and memory to observe, recollect, and narrate the things she saw or heard. Her answers to questions were responsive. She explained that the drugs she took 30 minutes before taking the stand were medication. Absent lawful confinement in a mental institution or an adjudication of insanity the burden of showing incompetency on account of unsoundness of mind is on him who objects on that ground, State v. Herring, 268 Mo. 514, 188 S.W. 169 [8], and that burden was not met in this case.

We turn now from the brief filed by appellants' counsel to the *pro se* briefs prepared by appellants. McCarty raises nine points. Schlup raises six points. Some of these points were included in the points raised by their counsel. Others were not properly preserved for appellate review.

[1]. "The following persons shall be incompetent to testify: (1) A person of unsound mind at the time of his production for examination."

We consider the remaining points properly raised.

Appellant Schlup challenges the sufficiency of the information in his case on seventeen separate grounds. Examination of each of the seventeen points discloses no insufficiency of the information, which follows the form approved in numerous previously adjudicated cases. State v. Edmonds, Mo.Sup., 347 S.W.2d 158; State v. Zammar, Mo.Sup., 305 S.W.2d 441. It contains all of the essential allegations and elements required to properly charge second degree burglary and stealing in connection therewith under §§ 560.070, 560.110, 560.156, RSMo 1959, V.A.M.S.

■ There was no error in overruling the motion to compel the State to disclose and produce "the tangible evidence" for inspection and copying. State v. Swiggart, Mo.Sup., 458 S.W.2d 251 (decided October 12, 1970).

■■ It is claimed that the prosecution withheld "certain evidence" (not specified) from the defense and introduced evidence during the trial "unknown to the defense" (not specified) which was not shown to be connected with the alleged crime. This point fails for indefiniteness and for the further reason that there is no rule requiring the State in advance of the trial to disclose all of its evidence to the accused. State v. Swiggart, supra.

■ It was not error to admit the burglar tools in evidence on the assigned ground that this constituted proof of a distinct and separate charge (possession of burglary tools) then pending in the Magistrate Court of Franklin County. No possible prejudice could have resulted because at no time was the jury ever informed that appellants had been arrested, taken into custody in connection with or actually charged with possession of burglary tools. State v. Holmes, Mo.Sup., 389 S.W.2d 30, 33. Even if the jury had been advised of the fact there would have been no error because this case falls within an exception to the general rule that evidence of a different crime is inadmissible, i. e., where the separate similar offense is so interrelated with the charge on trial that the proof of one tends to establish the other. State v. Kornegger, 363 Mo. 968, 255 S.W. 2d 765, 768, quoted with approval in State v. Smith, Mo.Sup., 431 S.W.2d 74, 79.

■ Appellants contend that there was a failure of proof because neither the safe nor the contents thereof were ever produced in evidence; because no value was placed upon the safe or upon the money therein and because there was no proof that appellants took, exercised dominion over or intended to keep the safe. There is no requirement in a prosecution for larceny in connection with burglary to produce and exhibit the stolen goods. It is sufficient to introduce oral testimony with reference to the property. Nor is the value of the property stolen material "so long as it ha[s] some value." See Brake v. State, Mo.Sup., 460 S.W.2d 639 (handed down in Division 2 concurrently herewith) on both propositions. On the latter question see also State v. Armstrong, Mo.Sup., 361 S.W.2d 811, 817 [5]. Mr. Bocklage testified that the safe contained $157.10. As indicated, appellants' taking, possession and asportation with intent to convert were sufficiently proved by circumstantial evidence.

No error appearing, the judgments of conviction in Cases Nos. 54,498 and 54,-499 are affirmed.

WELBORN and HIGGINS, CC., concur.

PER CURIAM:

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

SEILER, P. J., HOLMAN, J., and PINNELL, Special Judge, concur.

BARDGETT, J., not participating because not a member of the court when cause was submitted.