STATE of Missouri, Respondent,

v.

Robert Nathaniel OLDS, Appellant.

No. 61432.

Supreme Court of Missouri,
En Banc.

July 15, 1980.

Opinion Modified On Court's Own Motion.

Rehearings Denied Sept. 9, 1980.

Peter Stragand, Asst. Public Defender, 22nd Judicial Circuit, St. Louis, for appellant.

John Ashcroft, Atty. Gen., John M. Morris, III, Asst. Atty. Gen., Jefferson City, for respondent.

HIGGINS, Judge.

Robert Nathaniel Olds was convicted by a jury of first degree murder, § 565.003 Laws

of 1977[1]; statutory rape, § 559.260, RSMo 1969; attempted statutory rape, §§ 556.150 and 559.260, RSMo 1969; and two counts of kidnapping, § 559.240, RSMo 1969. His punishment was fixed at life imprisonment for first degree murder, fifty years for statutory rape, ten years for attempted statutory rape, and ten years for each count of kidnapping. Sentences and judgment were rendered accordingly with sentences to run consecutively except for one kidnapping count.

Appellant charges error to: (1) his arrest, (2) the search of his automobile, (3) his interrogation, (4) sufficiency of evidence to convict of attempted statutory rape, (5) failure to instruct on second degree murder and manslaughter, (6) conviction of felony murder and the underlying felony, and (7) closing argument by the State. Judgment affirmed except for the conviction of kidnapping underlying the felony murder.

On Friday, February 24, 1978, eleven year olds Kim Benton and Kathy Robinson lived a few houses apart on the north side of the City of St. Louis. At approximately 4:30 p. m. Kim and Kathy were walking west on Pershing Street toward a nearby market to purchase orange juice for Kim's mother. Defendant was parked on Pershing Street.

Defendant was a six foot one inch, huskily built, dark complexioned, black male, weighing more than 200 pounds, with short, black hair, sideburns, and a short beard. His car was a dirty brown-colored Chevrolet station wagon with brownish seats and a large whip antenna. The side windows were covered by a protective screen mesh and the back ones with brown curtains. The rear section contained a bed. A pine tree-shaped air freshener hung from the rear view mirror and beneath the dashboard was a C.B. radio.

As the girls passed by, defendant called out to them and asked where they were going. Kim told defendant she thought she recognized him as having come out of the 7th District police station earlier that day. Defendant explained that he was a plain clothes police officer. When the girls told defendant they were going to the grocery store, he gave them fifty cents and asked if they would buy him a Twinkie. They purchased a small confection, brought it to defendant in his car, then returned to the store to buy the orange juice. On their way home, defendant again called out to them from his parked car. He told them there was a bug in his cake, that he wanted them to return it, and persuaded them to accept a ride back to the store. When the girls got into the front seat of the station wagon, defendant made a U-turn and parked his car behind nearby vacant buildings.

He ordered the girls to undress; they complied. He forced Kathy to lie across his lap face down and tied Kim up with her own clothes, stuffed cloth into her mouth, put a sweater over her head, and pushed her onto the bed in the back of the station wagon; he then did essentially the same to Kathy. The girls were told to keep quiet or they would be killed.

After driving for a time, defendant stopped the car and got into the rear section with the girls. A short time following, Kathy cried out loudly. An autopsy later revealed blood on her legs in the pubic area, a ripped vagina, and semen within.

Defendant got back into the front seat, returned to the back, and turned his attention to Kim. He removed the sweater from her head and she saw that he was naked at least above the waist. He took off the pants binding her legs, told her to raise her legs, and tried twice to force the girl's legs apart. Unsuccessful both times, he asked her what was the matter, tied her up again, and returned to the front seat. A few minutes later he started driving again.

1. Section 565.003 provides:
   Any person who unlawfully kills another human being without a premeditated intent to cause the death of a particular individual is guilty of the offense of first degree murder if the killing was committed in the perpetration of or in the attempt to perpetrate arson, rape, robbery, burglary, or kidnapping. Effective 5 26 77.
   Thus in Missouri after 5 26 77, the only first degree murder is felony-murder.

Sometime after 8:30 p. m. defendant stopped and took Kathy, naked, bleeding and crying, out of the car. Kim, still inside, freed her hands and peered out the side window through a hole she scraped in the frost. Outside, she saw Kathy leaning up against a pole. Defendant was hitting her about the head and face with a large screwdriver; Kathy cried and screamed. As defendant continued to hit her, she slid down the pole. Finally, the beaten child slumped over and her crying stopped.

Defendant left her there in the snow, returned to the car, told Kim to get into the front seat, and drove onto U. S. Highway 40. He bundled up all the clothing except for Kim's coat, which he told her to put on, wrapped it in the white sheet from the bed in the rear, and tossed the bundle into a ditch. He then asked Kim some questions and wrote the name, address, and telephone number of her mother on a page in a music book. Near McKnight Road, defendant put Kim out into the snow wearing only her overcoat. She climbed up the embankment next to the highway where, after trying unsuccessfully to flag down cars, she just stood looking down.

Sometime later a passing motorist stopped to help the child and called the police. Kim was taken to the police station where she gave a detailed description of defendant and the station wagon. Based on that description the following bulletin was issued and was broadcast periodically:

Wanted, negro male, thirty-five to forty years of age, six foot one, weight, two hundred and forty-five pounds. It's got a big abdomen. She said a big belly. Short black hair, Sideburns to the bottom of his ears. Short, neat beard that started slightly below the ears. Wearing green work clothes or coveralls that button to the waist, and some teeth missing from the rear of his mouth. Wanted subject was driving a dirty, light green station wagon, possibly Ford. The windows on the driver's side and passenger side in the front have some sort of protective wire screening, and there is a bed in the rear with rollers. Under the dash-board is a CB sender with a red light in the upper part of the radio. There is a gray toolbox that did not have a lid as related by the witness. The vehicle has a long whip antenna on the right side. Witness also related that the assailant was wearing brown leather gloves and driving a vehicle having some sort of brown or beige curtains in the rear of the station wagon.

At about 11:30 p. m. Ladue police found the bundle of clothes and white sheet along U. S. 40, one-half mile east of McKnight Road. At approximately 12:20 p. m. the next day, Saturday, February 25, 1978, Officer Hoover on mounted patrol saw the nude body of a little girl with a white cloth tied around its neck lying half on the bank and half on the ice at the base of a bridge in Forest Park. She was pronounced dead on arrival at City Hospital. The body was later identified as that of Kathy Robinson. The cause of death was strangulation, blunt trauma to the head, and laceration of the vagina.

Officers Schmittgens and Wood were on patrol in the City of St. Louis later the same day. They heard broadcast the description of defendant and his car and recognized it as similar to a vehicle and driver they had stopped a month earlier. They called their sergeant and defendant's vehicle was located parked on the north side of the city. After observing its similarity to the radio description, Sgt. Forsting assigned Schmittgens to watch the car while he and Wood left to contact homicide officers. Fifteen minutes later defendant and a juvenile got into the car and drove away. Two blocks later they were stopped. Defendant got out without being asked to do so. Schmittgens told defendant he was being "stopped for an investigation" and patted him down, finding no weapons. At the pre-trial suppression hearing, Schmittgens testified he did not arrest defendant and that he was free to leave any time.

Two or three minutes later, detectives from homicide arrived. Defendant was arrested, handcuffed, advised of his rights, and taken to the police station. Although

officers looked into the vehicle at the scene of the arrest, and one door of the car was opened, no one entered the vehicle and nothing was seized. The car was towed to the police garage where Kim identified the vehicle and a number of items within. For the next five hours the Evidence Technician Unit thoroughly searched the car without a warrant. Found inside and seized were blood and semen stains, the music book containing the name, address, and phone number of Kim's mother, the mattress and blanket, the car air freshener, toolbox, briefcase, brown gloves, C.B. radio, pillow, Kim's panties, and a screwdriver with blood on it. Numerous photos were taken of the inside and outside of the car. Over defense objections, all of this evidence was admitted at trial.

At the police station, defendant was again advised of his rights and signed a consent to the search of his residence. Defendant accompanied two officers who searched his apartment and seized several items. They went from there to the police garage, then back to the station where defendant was given his rights again and questioned. He denied everything. At 8:45 p. m. the questioning stopped for a line-up, in which Kim positively identified defendant from a line of six subjects. He was returned to the homicide office for another fifteen or twenty minutes of questioning.

On the afternoon of the next day, defendant again requested he be taken to the homicide office. There he was read his rights and agreed to make a tape recorded statement. On this tape, played at trial, defendant admitted picking up the two girls, that something happened that should not have, that he had disposed of a body in Forest Park and released a girl on U. S. Highway 40. He said he was very sorry for what had happened and wanted help. At one point during this session defendant began to sob and indicated by waving his hand that he wanted the tape turned off. Regaining his composure, he requested the machine be turned back on so he could make a final statement.

At trial defendant offered several witnesses for purposes of an alibi defense. He denied that the taped statement was his and claimed harassment by the police while he was held. The jury was instructed, *inter alia*, on first degree murder of Kathy using the kidnapping of Kathy as the underlying felony. The jury was not instructed on second degree murder or manslaughter.

## I. ARREST

Appellant contests the constitutionality of his warrantless arrest claiming it was made without probable cause to believe he had committed a criminal offense.

An arrest without a warrant must be based on probable cause. Probable cause for an arrest without a warrant exists where the facts and circumstances within the arresting officers' knowledge and of which they have reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in a belief that an offense has been or is being committed, *State v. Wiley*, 522 S.W.2d 281 (Mo.banc 1975); and that the person arrested is guilty of that offense, *State v. Robinson*, 484 S.W.2d 186 (Mo.1972).

In this case, the arresting officers were aware of an all points bulletin issued pursuant to an eyewitness account which described in detail defendant and his distinctive looking automobile as being involved in a kidnapping, rape, and killing which took place less than 24 hours earlier. With minor discrepancies, defendant and his car matched this description. Common to the bulletin and the arrest scene were: a six foot one inch black male, heavy set, with sideburns and a short beard, driving a dirty station wagon with a whip antenna, wire screening on the side windows, a curtain on the back, and a bed in the rear section. Such circumstances of similarity adequately support a finding of probable cause to arrest without a warrant.

## II. AUTOMOBILE SEARCH

Appellant challenges the legality of the warrantless search of his car by the Evi-

dence Technician Unit at the police garage. The record shows that the vehicle was thoroughly searched and numerous items seized by police after defendant was safely in custody at the station and his vehicle impounded.

■ All searches without a valid warrant are unreasonable unless shown to be within one of the exceptions to the rule that a search must rest upon a valid warrant; the burden is on the State to show the search comes within an exception. *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Stoner v. California*, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964).

*Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), delineated the exception applicable to this case. Four men robbed a gas station and fled. Police were advised by the attendant and two teenage observers that one of the men was wearing a green sweater and another a trench coat and the four had escaped in a light blue compact station wagon. Within an hour the four men were stopped in such a vehicle two miles from the gas station. Defendant was one of the men in the car and was wearing a green sweater; there was also a trench coat in the car. The occupants were arrested and the car driven to the police station where it was searched without a warrant. The Court approved the search holding:

> the blue station wagon could have been searched on the spot when it was stopped since there was probable cause to search and it was a fleeting target for a search. The probable-cause factor still obtained at the station house and so did the mobility of the car unless the Fourth Amendment permits a warrantless seizure of the car and the denial of its use to anyone until a warrant is secured. In that event there is little to choose in terms of practical consequences between an immediate search without a warrant and the car's immobilization until a warrant is obtained.

*Id.* at 52, 90 S.Ct. at 1981.

That holding was affirmed in *Texas v. White*, 423 U.S. 67, 96 S.Ct. 304, 46 L.Ed.2d 209 (1975), where defendant was arrested on suspicion of passing forged checks. His car was taken to the police station where it was searched without a warrant. The Court approved the search and upheld the conviction:

> In *Chambers v. Maroney* we held that police officers with probable cause to search an automobile at the scene where it was stopped could constitutionally do so later at the station house without first obtaining a warrant. There, as here, "[t]he probable-cause factor" that developed at the scene "still obtained at the station house."

*Id.* at 68, 96 S.Ct. at 305.

■ In *State v. McCarty*, 460 S.W.2d 630 (Mo.1970), this Court stated:

> Prior to *Chambers v. Maroney* automobiles stopped upon the public highways could be searched without a warrant, where there was probable cause to believe that they contained articles (contraband) which lawfully could be seized. [citations] With the advent of *Chambers v. Maroney* it is now perfectly clear that this doctrine applies also to automobiles which after having been stopped on the streets or highways have been brought to the police station and are held in the custody and control of the police authorities, and that the search need not necessarily be for contraband but may be for stolen money or arms used in the robbery.

*Id.* at 635–636. *Accord, State v. Plant*, 461 S.W.2d 736 (Mo.1971). The arrest of defendant was based on probable cause and was constitutional within the rulings discussed above. At the scene, officers also had probable cause to search defendant's vehicle as containing evidence of the crimes of murder, rape, and kidnapping. That the officers chose to impound the vehicle before conducting their search an hour later, did not dispel the probable cause to search that had obtained at the scene of the arrest.

## III. THE INTERROGATION

Appellant contends the taped and transcribed statement he made the afternoon

after his arrest should have been suppressed as obtained pursuant to a defective *Miranda* warning. The relevant part of that warning as given to defendant reads as follows:

> In the event you cannot afford an attorney, every effort will be made to provide you with an attorney.

Appellant contends that the difference between this warning and the one required by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) makes defendant's confession inadmissible. He does not explain why. Presumably he argues that absent proper advisement of his rights to silence and to presence of an attorney, any waiver of those rights is invalid.

*Miranda v. Arizona, supra,* held that prior to any questioning, a defendant in custody must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. Further,

> The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently.

*Id.* at 444, 86 S.Ct. at 1612.

At issue is whether defendant was properly advised of his rights, and whether he voluntarily, knowingly, and intelligently waived those rights.

■ The record demonstrates that within the 21 hours immediately preceding defendant's statement, his rights were read to him four times, only the fourth of which is challenged. Each time, defendant indicated he understood those rights; twice he signed a written waiver form. Appellant points to nothing in the record to indicate he was misled in any way by the defective warning. After the warnings had been properly read three times, defendant himself asked to be brought upstairs to make a statement. Following that request came the questioned statement of his rights. Under these circumstances, that the fourth reading of defendant's rights within 21 hours differed in one respect from the formula set out in *Miranda v. Arizona, supra,* did not render the waiver of those rights invalid.

Appellant further charges that his *Miranda* rights were violated when questioning continued after he indicated his desire to remain silent.

*Miranda v. Arizona, supra,* further held:

> If [an] individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. . . .
> Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked.

*Id.* at 473–74, 86 S.Ct. at 1627–28.

The record reflects that on Sunday afternoon, two days after the crime and approximately 21 hours after arrest, defendant asked to talk to homicide officers. After he was read his rights, as discussed above, defendant began his taped statement. Part way through, defendant began to sob, put his head in his hands, and gestured the officers to turn off the tape recorder. Defendant then indicated he wanted to continue and make a final statement. The tape recorder was turned back on and the following transpired:

> The time is now 2:25 p. m. Today's date is 2/26/78 and Robert Olds has just expressed a desire to Detective Sergeant Phil Antoon and myself, Detective Larry Ventimiglia, that he wants to conclude this conversation. He stated that he did want to make a closing statement on this cassette tape.
>
> A. Yes.

■ For defendant, who has begun sobbing during his explanation of a horrid event of the recent past, to indicate his desire that the tape recorder be turned off is not the equivalent to invoking his Fifth Amendment privilege against self-incrimination, particularly where he asked to continue the taped statement immediately thereafter. Under such circumstances, defendant's gesture was not tantamount to invocation of his right to remain silent such as would render inadmissible further statements and it cannot be concluded that the

trial court erred in finding that, adequately advised, defendant voluntarily waived his right to silence.

## IV. ATTEMPTED STATUTORY RAPE

Appellant questions the sufficiency of evidence to convict of the attempted statutory rape of Kim. In review of evidentiary sufficiency, the facts in evidence and all favorable inferences reasonably to be drawn therefrom must be considered favorably to the State and all inferences to the contrary must be disregarded. *State v. Franco*, 544 S.W.2d 533 (Mo.banc 1976) *cert. denied*, 431 U.S. 957, 97 S.Ct. 2682, 53 L.Ed.2d 275.

Section 559.260, RSMo 1969 defines statutory rape as carnally and unlawfully knowing any female child under the age of sixteen years, and the attempt to commit such act is punishable under § 556.150.

Case law has defined the elements necessary to constitute attempt as: (1) the intent to commit the crime, (2) an overt act toward its commission, (3) failure of consummation, and (4) the apparent possibility of commission. *State v. Miller*, 368 S.W.2d 353 (Mo.1963). Although mere preparation is not sufficient, the overt act need not be the ultimate step toward, or the last proximate act or the last possible act in the consummation of the crime attempted. *State v. Thomas*, 438 S.W.2d 441 (Mo.1969).

The evidence shows that after defendant had raped Kathy, he crawled back into the front seat of the car for a few minutes. He then returned to the rear section, removed the sweater from Kim's face and untied the pants securing her legs. Defendant was naked at least above the waist. He told the victim to raise her legs, then twice tried to force them apart. Unsuccessful, he said, "What is the matter with you". He then bound her and covered her face again. Medical testimony indicated redness and a small amount of blood near the opening of the victim's vagina. These facts support the necessary elements of intent, overt act, failure, and ability.

## V. HOMICIDE INSTRUCTIONS

Appellant charges error to the Court's failure to instruct the jury pursuant to MAI–CR 2d on the lesser included offenses of second degree murder and conventional manslaughter when it instructed the jury on first degree murder. He asserts the jury was thus "prevented from deciding the presence or absence of the mental elements constituting the various types of homicide."

MAI–CR 2d 15.00 series, effective April 12, 1978, applies to homicides committed after May 25, 1977. The Supplemental Notes on Use provide:

\* \* \* \* \* \*

3. The submission of lesser grades or necessarily included offenses.

\* \* \* \* \* \*

e. Subject to a-c above, if murder in the first degree is the highest homicide submitted, the court must give the following instructions:

MAI–CR 15.18 on conventional manslaughter.

The court must also give either one or both of the following instructions which are justified by the evidence:

MAI–CR 15.14 on conventional second degree murder, and MAI–CR 15.16 on any second degree felony-murder.

The trial court instructed the jury on first degree murder; it did not instruct on conventional manslaughter, conventional second degree murder or second degree felony-murder.

Rule 28.02(e) provides:

Giving or failing to give an instruction or verdict form in violation of this Rule or any applicable Notes on Use shall constitute error, its prejudicial effect to be judicially determined.

*State v. Graves*, 588 S.W.2d 495, 497 (Mo. banc 1979) stated that any error associated with non-compliance with MAI is presumptively prejudicial unless the contrary clearly appears.

Instruction No. 6 (MAI–CR 15.08 and 6.17) directed the jury to find defendant guilty of first degree murder if it found

two things: that between 4:30 p. m. on February 24 and 1:55 p. m. on February 25, 1978, defendant caused the death of Kathy Robinson and that he did so in kidnapping her. The jury found both and returned the verdict indicated. Such verdict was supported in the evidence, and the evidence did not justify submission of any theory that she was killed by anyone other than her kidnapper.

Instruction No. 7 (MAI–CR 3.20) submitted defendant's defense of alibi.

In other circumstances it would be speculation whether a jury would have chosen to convict of manslaughter or second degree murder if offered the chance to do so, and this Court may not so speculate. In this case, that the jury would not have made such a choice is shown from its finding that defendant did kidnap Kathy Robinson between the times specified.

To convict of the lesser crimes of second degree murder or manslaughter, the jury necessarily would have found that defendant killed the victim. Such a finding juxtaposed to the finding of kidnapping would have led the jury back to a finding of first degree murder. This is particularly true when considered with the defense in this case. There is no dispute that the kidnap-murder of Kathy Robinson took place; the dispute is limited to a contention of alibi. In these circumstances defendant was to be either acquitted of the charged killing on the basis of his alibi defense or found guilty of first degree kidnap-murder. *See State v. Ayers,* 470 S.W.2d 534, 538 (Mo.banc 1971); *State v. Bradley,* 234 S.W.2d 556, 563 (Mo. 1950).

■ Thus, where there is a finding that defendant kidnapped the murder victim; there is no showing other than that the killing occurred during the kidnapping; the defense to the killing is not that it was other than felony-murder, but that defendant was not there at all; and given Missouri law, § 565.003, *supra,* that a killing during a kidnapping is not second degree murder or manslaughter but first degree murder, two things may be concluded: An instruction on second degree murder is not "justified by the evidence," and the failure to give same is not error; failure to instruct on manslaughter contrary to court rule, did not prejudice this defendant.

Appellant would support his contention by *State v. King,* 577 S.W.2d 621 (Mo.banc 1979) which remanded for retrial a first degree murder conviction after the trial court had failed to instruct on the lesser included offenses of second degree murder and manslaughter as directed by MAI–CR. *State v. King, supra,* does not apply to this case because there the first degree murder was not felony-murder but was the "traditional" premeditated first degree murder, defined in prior § 559.010; and the Court concluded that given the option to do so, the jury could have found a lesser mental state and thus have convicted of second degree murder or manslaughter. As discussed above, under the evidence in this case the jury could find felony-murder as submitted but not a homicide requiring a lesser mental state.

## VI.   UNDERLYING FELONY

Appellant contends as a matter of plain error, Rule 29.12(b), that he was impermissibly sentenced to separate punishments for first degree murder and the underlying felony of kidnapping Kathy Robinson as a violation of the double jeopardy provision of the Fifth Amendment to the United States Constitution.

The similar question whether imposition of cumulative punishments for conviction of statutorily defined felony-murder and the underlying felony of rape is permissible was considered by the United States Supreme Court in *Whalen v. United States,* 445 U.S. 684, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980).

Whalen was convicted in the District of Columbia Superior Court of rape and of killing the same victim in the perpetration of rape. He was sentenced to consecutive terms of imprisonment of 20 years to life for the killing and 15 years to life for the rape. He argued that his sentence for the offense of rape must be vacated because that offense merged for purposes of punishment with the felony-murder offense.

Addressing this claim, the Court stated: whether punishments imposed by a court after a defendant's conviction upon criminal charges are unconstitutionally multiple cannot be resolved without determining what punishments the Legislative Branch has authorized.

*Id.* at 688, 100 S.Ct. at 1436.[2] *See also Busic v. United States,* —— U.S. ——, 100 S.Ct. 1747, 64 L.Ed.2d 381 (1980) which mandates determination of legislative intent as the starting point in multiple punishment analyses.

Sections 565.003 (first degree murder) and 559.240 (kidnapping) do not contain a legislative intent or directive that a defendant may be separately punished if one offense is determined to be a lesser included of the other. Further, nothing elsewhere in the Missouri Criminal Code then existing[3], indicates an intent on the part of the Missouri General Assembly to allow a separate punishment for one offense included in another.

■■■ Thus, it cannot be demonstrated that the Missouri legislature intended to allow a court to separately punish a defendant both for felony-murder and the underlying felony, and the conviction for the kidnapping of Kathy Robinson must be vacated.

This Court reached the same result in *State v. Morgan,* 592 S.W.2d 796 (Mo.banc 1980)[4], decided prior to and thus without benefit of the analysis of *Whalen v. U. S., supra.* Morgan stole cigarettes, money, and a check protector from a gas station. Police were called and the high speed chase that ensued ended when defendant's car struck another car killing a passenger within. He was convicted in one trial of stealing over $50 and second degree (felony) murder. This Court held that the underlying felony is a lesser included offense of felony murder and convictions and sentences of both cannot stand whether as a result of one prosecution or two.

## VII. CLOSING ARGUMENT

Appellant contends that during closing statement the prosecutor impermissibly argued a connection between the need to convict defendant and the safety of the jurors' own children. The relevant portions of that argument follow:

If only one, if only one little Kathy in the future does not have to go through this, then let your message be loud. Let your message be strong. Let your message be heard.

We depend upon you as officers of this Court, which you are. You are as much an officer of this Court as I, Mr. Lane, or the Court; and, as an officer of this Court, you have a duty, not only to find him guilty—

\* \* \* \* \* \*

As I was saying, it's not only your duty to find this defendant guilty and under the evidence in this case, under all the evidence in this case, that is the only real issue here, isn't it, the time? The time. And the time that you assess against this man may well be a deterrent. May well be a deterrent for others who would fix up their automobiles such as this and prowl the neighborhood and create a holocaust for one of our children or for both of our children.

\* \* \* \* \* \*

For the crime here that was committed, no number of years could be commensurate. But a sentence, whether it be a

---

2. The Unites States Supreme Court proceeded to find that the District of Columbia legislature (Congress) by separate statutory provision had mandated that a defendant may not be subjected to multiple punishments for two crimes found to be the same offenses under the rule of statutory construction articulated in *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306. Once the legislature proscribes double punishment, the court is thereafter barred from doing otherwise.

3. Since the date of the commission of the offenses in this case, the Missouri General Assembly enacted § 556.041, RSMo 1978, effective 1–1–79, which provides limitation on conviction for multiple offenses.

4. Application for certiorari to the United States Supreme Court is pending.

hundred or a thousand or whatever, at least, would screen out to the community that this will not happen, that the people of St. Louis will not let their children happen this way, that you as people of the City of St. Louis will not tolerate this.

This is our town. It is not Ladue. It is not Town and Country. This is our town. And this is all we have, and we will not have butchers running around in these kinds of automobiles butchering our little girls.

And I tell you under the law and under God and under evidence, this man is guilty, and he deserves a punishment that he will remember and that society will remember—

■ The trial court is accorded discretion in determining the scope of counsel's argument to the jury and unless an abuse of discretion is demonstrated to the prejudice of the accused, the case will not be reversed on appeal. *State v. Wood*, 596 S.W.2d 394 (Mo.banc 1980); *State v. Conger*, 540 S.W.2d 169 (Mo.App.1976).

■ It is permissible for the State to argue the necessity for law enforcement and ask for a severe penalty as a deterrent to others, *State v. Raspberry*, 452 S.W.2d 169 (Mo.1970); and to argue both the prevalence of crime in the community and for the personal safety of its inhabitants, *State v. McKinney*, 475 S.W.2d 51 (Mo.1971); and that conviction of defendant is part of the jury's duty to prevent crime, *State v. Wright*, 515 S.W.2d 421 (Mo.banc 1974). The prosecutor is accorded latitude in these areas and is further permitted to urge the jury to consider what conditions will result in society upon failure to uphold the law. *State v. Elbert*, 438 S.W.2d 164 (Mo.1969).

■ The prosecutor's argument in this case asked that the jury send a message to the community; that a sentence be imposed to deter others from committing the same type of crime; that the jurors not allow others to do as defendant had. He did not argue that the families of the jurors would be endangered by this defendant if he were acquitted. Thus, this argument falls within

the limits allowed, and the trial court did not abuse its discretion by permitting it.

Accordingly, defendant's convictions for the first degree murder of Kathy, the statutory rape of Kathy, the attempted statutory rape of Kim, and the kidnapping of Kim are affirmed; the conviction for the underlying kidnapping of Kathy is vacated.

BARDGETT, C. J., and WELLIVER and MORGAN, JJ., concur.

SEILER, J., concurs in separate concurring opinion filed.

DONNELLY and RENDLEN, JJ., concur in result.

SEILER, Judge, concurring.

As appears from the principal opinion, defendant's claim with respect to failure to instruct upon second degree murder is based on the sole contention that the trial court was obligated to instruct on conventional second degree murder by virtue of the provisions of the Supplemental Notes on Use in MAI–CR2d 15.00 series that where first degree murder is the highest homicide submitted, an instruction on conventional second degree murder must be given where "justified by the evidence." In response to that particular contention, I agree with the principal opinion that the contention necessarily is answered against defendant because under the facts of this case there was no evidence other than that the killing of the victim took place while the kidnapping was still going on, whoever committed the crime.

In addition, although not mentioned by the parties in their briefs or arguments, instructing on conventional second degree murder would have created problems, as there was no separate charge of conventional second degree murder. *See State v. Handley*, 585 S.W.2d 458, 462–63 (Mo.banc 1979).