STATE of Missouri,
Plaintiff-Respondent,

v.

Paul SAVAGE, Defendant-Appellant.

No. 11060.

Missouri Court of Appeals,
Southern District,
Division Two.

July 21, 1980.

C. R. Rhoades, John R. Sims, Ruyle & Sims, Neosho, for defendant-appellant.

John Ashcroft, Atty. Gen., Kathleen Mills, Paul M. Spinden, Asst. Attys. Gen., Jefferson City, for plaintiff-respondent.

MAUS, Judge.

The defendant was charged with the capital murder of David Love. A jury found the defendant guilty of manslaughter and fixed his punishment at imprisonment for nine years and six months. The defendant's timely motion for a new trial was overruled and he was sentenced in accordance with the verdict. He appeals presenting two points of error. As there is no doubt about the sufficiency of the evidence to support the conviction, only a brief summary of the facts that could have been found by the jury is necessary. In so summarizing the facts, in the light of the verdict, the evidence will be reviewed most favorably to the state. *State v. Hayes*, 597 S.W.2d 242 (Mo.App.1980).

The dramatis personae in this unfortunate tragedy include the following: the defendant, a farmer who was 73 years old at the time; the victim David Love, also a farmer, age 50 at the time; and Ansel Breeding, a livestock dealer. The defendant and victim lived on neighboring farms in a rural community in Southwest Missouri. They were close friends. Breeding had been acquainted with both Savage and Love for 15 or 20 years. Late in the afternoon of the day in question, in the neighborhood where Savage and Love lived, Breeding met them while they were riding in Love's pickup truck. Apparently Breeding had business to discuss with Love and during the encounter the three decided to look at cattle on several farms in the area. Breeding got in the Love pickup as a passenger, but after a short distance became the driver because Savage and Love had been drinking. The two continued drinking during the trip and became quite drunk. Along the route Savage and Love began to quarrel, perhaps initially in a jocular manner. At one point, Savage put his arm around Love's neck in such a manner that Love began gasping for breath. When he freed himself, Love began hitting Savage in the face. The strength of the blows is not clear, but he hit him 10 or 15 times, wearing a ring, and Savage bled rather heavily. Breeding calmed them down and drove to the Savage home. As they approached, another quarrel developed. Nevertheless, Breeding was successful in getting Savage from the pickup and helping him to the front door. Unknown to Breeding, Savage had taken the keys to the pickup. After returning to the pickup and discovering the keys were missing, Breeding went back to the house. He found Savage coming from the back room with a gun in his hand. Mrs. Savage was pleading with him, "please don't". When Breeding tried to dissuade Savage from his apparent course of action, Savage threatened Breeding. Breeding left by a side door and went to the pickup where he unsuccessfully tried to get Love to run, or leave in some manner. About that time Breeding saw Savage come from his front door and raise his gun. Breeding ran to the nearby Love home. As he was running he

heard five shots. On the fourth shot a bullet whistled over his head and the fifth shot sounded "real dull". In 10 or 15 minutes he returned with Mrs. Love and found David Love lying by the passenger's side of the pickup. He was dead from a shot through the heart. Savage was standing where he had last been seen by Breeding. When the sheriff arrived he found a .38 caliber Smith and Wesson revolver in an ashtray in the dining room. The cylinder contained five spent shells and one live shell. A bullet was lodged in the barrel. This bullet was pushed backward out of the gun. A ballistics expert testified he could not make a positive identification of the bullet taken from the deceased because of the poor condition of that bullet and the fact the condition of the barrel had been altered by the backward pushing. However, he stated the bullet had been fired from a .38 caliber Smith and Wesson and "most probably" from the gun found by the sheriff. The defendant did not testify. The testimony of Mrs. Savage in some particulars contradicted these facts, otherwise established by the testimony of Breeding.

The defendant's first point is based upon a statement made in the state's closing argument. The incident complained of is as follows:

> "Mr. Paul: It's up to you twelve people what Paul Savage's punishment will be. It will be up to you to decide whether you put this gun in his hands again and let him walk out that door with that gun in his hands to—
>
> Mr. Rhoades: Object to this—
>
> Mr. Paul: —use it in the same—
>
> Court: Just a minute, Mr. Paul. The objection will be sustained."

The defendant contends the trial court committed reversible error in not declaring a mistrial, as he thereafter requested.

Primarily upon the basis of an appeal for law enforcement the following similar arguments have been approved. If you want a community where they shoot people on the streets, slap the defendant on the wrist, State v. Cox, 352 S.W.2d 665 (Mo.1962); if you want this type of man walking the streets, State v. Crawford, 478 S.W.2d 314 (Mo.1972); don't return this individual to our streets, "[t]he next time it is not going to be little Mr. Alper's shoe . . .", State v. Coleman, 524 S.W.2d 27, 31 (Mo. App.1975); an argument that if the defendant was found not guilty the prosecutor would give him the shotgun and send him back on the street, Street v. Bryant, 548 S.W.2d 209 (Mo.App.1977). On the other hand, the following arguments have been condemned: Repeated entreaties not to permit robbers who brandish guns to be in society and a reference to all of us being afraid; State v. Heinrich, 492 S.W.2d 109 (Mo.App.1973); arguments concerning likelihood of defendant committing other rapes, State v. Couch, 523 S.W.2d 612 (Mo.App. 1975); an appeal for conviction so the jurors could go out without getting carved up or shot, State v. Ellinger, 549 S.W.2d 136 (Mo.App.1977). It is not clear the argument in question was improper, particularly since there was evidence the defendant carried the gun in his truck. State v. Bryant, supra.

■ However, this court need not and does not decide the propriety of the argument in question. The trial court sustained an objection to that argument. The defendant now argues the trial court compounded its error in not declaring a mistrial because it did not instruct the jury to disregard that argument. However, the defendant did not request such an instruction. State v. Johnson, 285 S.W. 422 (Mo.1926). The question is whether or not the argument required the drastic remedy of a mistrial. The argument, if improper, was not flagrantly so. State v. Hampton, 559 S.W.2d 224 (Mo.App.1977). It was not personalized to cause the jurors to fear for their own safety. As distinguished from State v. Heinrich, supra, it was an isolated statement with no attempt to repeat it or to make any similar argument. " 'Whether or not a particular improper argument is so prejudicial under the facts in the particular case, as to necessitate a reprimand of counsel or a discharge of the jury, is largely within the discretion of the trial court. An

appellate court will not interfere unless the record shows that the trial court abused its discretion to the prejudice of the appellant.'" *State v. Hutchinson*, 458 S.W.2d 553, 556 (Mo. banc 1970). The trial court determined that a mistrial was not required and in so doing did not abuse its discretion.

The defendant's second point concerns the mental capacity of Breeding to be a competent witness. On preliminary questioning on direct examination Breeding stated that in January before the trial in April, he had been hospitalized and treated by medication and shock treatments. He said his memory had been affected concerning things that had happened from the date of the treatments to the time of trial. Then Breeding, without objection, proceeded to testify concerning the events in question. On cross examination Breeding described a shock treatment as receiving a shot and being out for about 30 minutes. He said he was taking medication to "slow him down". The only medical evidence came from a doctor offered by the defendant, the doctor who had treated the defendant after the incident. He was offered primarily to establish the defendant's condition. However, he stated that he was familiar with shock treatments and in essence testified that such treatments could affect the subject's memory for things occurring within two or three months before the treatments, but probably not for things occurring a year before the treatments. It must be noted that the incident occurred in January preceding the January in which Breeding received the treatments. To support his charge of incompetency the defendant also cites inconsistencies in Breeding's testimony such as: difficulty in remembering he had talked with defense counsel two days after the incident; a contradiction with his preliminary hearing testimony concerning whether there was one episode or two episodes of Love hitting Savage; and Breeding's lack of knowledge of Savage's arthritic condition when it was established that the defendant had suffered from arthritis since 1925.

The defendant first urges this court, on the basis of the plain error doctrine, to find,

the trial court, upon learning of the shock treatments and memory impairment, erred in not, on its own motion, excluding the testimony of Breeding or striking it from the record or granting the defendant a new trial. So far as mental capacity is concerned, a witness is competent when "'he understands the nature of an oath and that he possesses mental capacity sufficiently to observe and recollect and narrate the things he saw or heard.'" *Dennis v. Sears, Roebuck & Company*, 461 S.W.2d 325, 330 (Mo. App.1970). "Absent lawful confinement in a mental institution or an adjudication of insanity the burden of showing incompetency on account of unsoundness of mind is on him who objects on that ground . . . ." *State v. McCarty*, 460 S.W.2d 630, 637 (Mo. 1970). These principles have been applied even though a witness for an undisclosed reason lived at a state hospital, *State v. Simerly*, 463 S.W.2d 846 (Mo.1971); had been adjudged to be incompetent but was restored, *McCrary v. Ogden*, 267 S.W.2d 670 (Mo.1954); or had received electric shock treatments at a state hospital and was taking medication at the time of trial, *State v. McCarty*, supra. The burden is not altered by showing that the witness was a voluntary patient in an institution. *State v. McCarty*, supra.

■ There was no medical evidence that Breeding's testimonial competency had been impaired by the shock treatments. That evidence was to the contrary. Breeding's testimony showed it was not so impaired. The fact he was working as a livestock dealer, rancher and sale barn operator is significant. As a witness, he was alert to the questions. His answers were responsive and intelligently expressed. His memory of the details of the incident, when tested by independent evidence, generally proved to be remarkably accurate. It is certain able counsel diligently developed every inconsistency in the memory and testimony of Breeding. The inconsistencies demonstrated do not belie his capacity. *McCrary v. Ogden*, supra. Had the evidence developed Breeding's testimonial incompetency, there is no doubt the astute trial court would

have sua sponte taken appropriate action. However, the record demonstrates his competency as a witness, *State v. McCarty*, supra; *State v. Cox*, supra, 352 S.W.2d 665, and the trial court did not err.

 The defendant's next contention concerning Breeding's testimonial competency is based upon the following incident at the trial:

"Q. One of the purposes for the electrical shock therapy is to block out your memory, isn't that true?

Mr. Paul: Object to—

Mr. McFarlane: Object as not being relevant to the issues before this Court.

Mr. Rhoades: He is the patient and he knows the purpose of the treatment.

A. They didn't say what the purpose was.

Q. You are aware, are you not, that one of the purposes for the electrical shock treatment or therapy is to block out your memory?

Mr. McFarlane: It's not relevant.

Court: Sustained. The witness said he was not informed of the purpose for the treatment."

The defendant argues the objection was improperly sustained because the second inquiry was not answered by the fact the witness had said he wasn't informed of the purpose of the treatment. He concludes that the trial court erred in improperly limiting cross examination of Breeding concerning his memory loss.

The record shows that substantially the same question was asked two times. Neither question was limited to any source from which Breeding gained any knowledge concerning the purpose of shock treatments. His answer to the first question was clearly a response that he didn't know the purpose as "they didn't say what the purpose was". Therefore, the ruling of the trial court was correct on the basis stated. There is no indication the trial court limited the defendant's inquiry into the state of Breeding's memory. The defendant made no offer of proof. He asked no further questions of Breeding concerning his memory or state of mind. The defendant was permitted to pursue the subject with the doctor who treated the defendant. The record in no way supports the assertion the trial court improperly limited defendant's cross examination of Breeding and that contention is denied. The defendant and the state were diligently and vigorously represented by able counsel. Trial was had before an experienced and learned trial court. The defendant was found guilty by a jury. No error has been demonstrated and the judgment is affirmed.

BILLINGS, P. J., and PREWITT, J., concur.